Norman R. COWPER, Appellant–Respondent,

v.

Ray A. COLLIER and John D. Collier, Appellees–Petitioners.

No. 32A01–9812–CV–441.

Court of Appeals of Indiana.

Dec. 27, 1999.

Don A. Tabbert, Wm. D. Lalley, William W. Matthews, Tabbert Hahn Earnest & Weddle, Indianapolis, Indiana, Attorneys for Appellant.

Gregory W. Black, Deckard & O'Brien, Danville, Indiana, Attorney For Appellees.

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Amicus Curiae.

## OPINION

BAILEY, Judge

### Case Summary

Appellant Norman Cowper ("Cowper") appeals from the trial court's judgment, which reversed and vacated an order entered by the Indiana Natural Resource Commission ("NRC"). The NRC, acting under the Indiana Timber Buyer's Act ("TBA"), IND.CODE § 25–36.5–1–3.2, affirmed the decision of an administrative law judge ("ALJ") which concluded that there was no enforceable contract between Cowper and Ray and John Collier ("Tree Buyers") and that Tree Buyers were liable to Cowper. Tree Buyers petitioned the trial court for judicial review. After reviewing the findings promulgated by the NRC, hearing oral argument by the parties, and considering the parties' proposed findings of fact and conclusions of law, the trial court determined that a contract existed between Cowper and Tree Buyers, and that the TBA did not extend jurisdiction to the NRC to interpret that written contract. We reverse the trial court in part and remand to the NRC to determine damages.

### Issue

Cowper raises three issues on appeal which we consolidate and restate as follows:

> Whether the NRC erred by granting relief to Cowper with respect to those trees acquired in excess of the number provided for by contract.

### Facts and Procedural History

Cowper owns approximately 50 acres of land, much of it covered with timber. (R. 531). In 1993, a storm damaged numerous trees located on Cowper's land. (R. 531). Cowper wanted to sell the damaged timber. (R. 531). Cowper contacted several loggers and timber companies regarding the sale of the damaged timber. (R. 979–

983, 988, 992). From these contacts, Cowper learned that he would need to also sell undamaged trees to make the sale worthwhile for loggers. (R. 584).

On February 3, 1994, Cowper entered into a contract with Tree Buyers, which reads in pertinent part as follows: [italics indicate handwritten terms]

### TIMBER CONTRACT

No. 025

*Norman R. Cowper*
of *Morgan* County
State of *Ind[.],* hereby sells to
JOHN COLLIER LOGGING, R.R. 1, Box 413, Coatsville, IN 46121
for the sum of *Twelve Thousand Five Hundred* Dollars *($12,500.00)* the receipt of *Twelve Thousand Five Hundred* Dollars *($12,500.00)* of which amount is hereby acknowledged, the standing timber described as follows:

*18" and up on stump*

*the attached document shall be a part of this contract the same as if printed here*

located upon the following described real estate in *Morgan* County, State of *Ind[.]* to-wit: ·

*SE1/4, SE1/4 SEC. 36 T13 R1W (40A) AND PART of NE1/4, NE1/4 SEC. 1 T12 R1W (12A MORE OR LESS)*

JOHN COLLIER LOGGING, their agents, subcontractors, and assigns shall have the full and free rights of ingress and egress with trucks, tractors, and other logging equipment, to and from and upon the land of the sellers, for the purpose of cutting, felling and removing said timber and unless otherwise stated in this contract, is granted a period of *15 months* from this date to remove same. The seller and owner of said land on which timber is located expressly warrants title and right to sell the timber herein referred to, and that there are no liens or mortgages of any kind against same.

In event original owner and seller desires to sell above mentioned farm, and the timber belonging to JOHN COLLIER LOGGING, has not been removed, he must reserve same in deed to new owner, showing JOHN COLLIER LOGGING as timber.

Witness One hand this *3* day of *Feb[.],* 19*94*

Witness:

Ray Collier [signature]
Norman R. Cowper [signature]

[page 1]

The handwritten document incorporated by reference in the first page of the contract reads as follows:

*FEB. 3, 1994*

*MARTINSVILLE, IN 46151*

*TOTAL NUMBER OF TREES 18" IN DIAMETER OR GREATER IS 175 PLUS 26 16" DIAMETER OR LARGER THAT ARE STORM DAMAGED.*

*ADDITIONAL STORM DAMAGED TREES NEAR THE RESIDENCE WILL BE FELLED AS AGREED.*

*COLLIER TIMBER WILL FURNISH AN INSTALL 36 LINEAL FEET OF 24" DIAMETER 16 GA. CORRUGATED AND GALVANIZED STEEL CULVERT, NECESSARY SITE PREPARATION, AND AT LEAST 100 TON OF # 1 CRUSHED STONE .... SAID ROAD AND CULVERT IS FOR INGRESS AND EGRESS DURING THE LOGGING OPERATION AND IS TO REMAIN FOR OWNERS USE AFTER THIS CONTRACT EXPIRES. THIS ROAD AND ALL OTHER HAUL ROADS SHALL BE REPAIRED AT THE END OF LOGGING OPERATIONS.*

. . . .

*Ray Collier* [signature]
*Norman R. Cowper* [signature]

[page 2]

(R. 26–27). Tree Buyer (Ray Collier) filled in the amount to be paid for the trees, the phrase "18" and up on stump," as well as the phrase "the attached document shall be a part of this contract as if printed here." (R. 603, 1454). The second page of the above contract, with exception of the number of trees to be logged, was handwritten and prepared by Cowper prior to the date of signing. (R. 606, 765). Cowper and Tree Buyer (Ray Collier) discussed the number of trees to be inserted in the blanks, the numbers "175" and "26" were then inserted, each page signed and stapled. (R. 766). Several counts of stumps, taken after Tree Buyers had completed the logging of Cowper's property, revealed that approximately 500 undamaged trees of 18 inches in diameter were taken. (R. 202). Cowper contends that the contract limited Tree Buyers to 175 undamaged trees of 18 inches and up, and 26 damaged trees of 16 inches and up. (R. 532). Tree Buyers contend that the contract did not limit the number of trees 18 inches and up on the stump. (R. 532).

Cowper filed a complaint with the NRC, alleging that the parties had contracted for the removal of no more than 175 trees 18 inches in diameter and sought treble damages for the approximately 325 trees which were taken without his permission. (R. 853). This matter was tried before the ALJ for the NRC. The ALJ ruled that between the parties no valid written contract existed. (R. 208).

The ALJ considered the following findings in assessing the fair market value of Cowper's timber:

42. Cowper had one prior experience in selling timber off his property in 1982, when he sold 350 trees for approximately $20,000, an average of $55–$60 per tree.

43. While it is true that the timber cutter in 1982 would have picked the best 350 trees he could find at that price, to find that Cowper intended to sell over 500 trees for approximately $15,000 in compensation, the trier of fact would have to conclude that Cowper was willing to sell his marketable trees for ½ that amount per tree.

44. . . . . [T]here is no evidence in the record from which a conclusion can be drawn that Cowper would sell his trees for 50% of the per-tree price some 12 years later in an inflationary economy.

45. Conversely, the trees involved in the cutting were trees that were passed over 11 or 12 years before this cutting and with the exception of some quality oak trees, were not high grade timber.

. . . .

The ALJ also considered the testimony of two consultant foresters, Hudson, who had walked Cowper's property and derived the value of the trees from the remaining stumps, and Stambaugh, who reviewed the methodology employed by Hudson. (R. 203–04). Additionally, the ALJ heard testimony from Kelly, a forester and timber buyer specializing in veneer quality timber. (R. 205).

83. Based on the stump size, species, and normal tapering, Hudson estimated the stumpage value at approximately $50,000.

. . . .

89. Stambaugh agreed with the approach and methodology employed by Hudson.

. . . .

93. Kelly looked at the timber while it was standing.

94. Kelly was not interested in submitting a bid because only white oak was of veneer quality and most of the white oaks had been taken during the first cutting 10 years ago.

95. Kelly told Cowper he might get $10,000. . . .

. . . .

99. The evidence presented by [Tree Buyers] and their bookkeeper indicated that the value received at mill was just under $50,000.

(R. 204–05). The ALJ concluded that "a fair stumpage value would appear to be approximately $30,000." (R. 205). The ALJ also approached valuation on a per-tree basis. (R. 206).

116. Even adjusting for wind shake, some fire damage, and a lower percentage of veneer quality trees, the fair market value would be in excess of $60 per tree.

117. At $65 per tree plus $600 for the value of the storm damaged trees [undisputed by the parties], the stumpage value would be approximately $33,000.

(R. 206). The ALJ concluded that the fair market value of Cowper's cut timber was $32,000, and that Cowper had been underpaid by $16,000. (R. 207). The ALJ awarded Cowper treble damages in the amount of $48,000. (R. 208–09).

In ruling, the ALJ relied upon IND.CODE § 25–36.5–1–3.2, which provides in pertinent part as follows:

(b) The department [NRC] may under IC 4–21.5–3–8 commence a proceeding against a timber cutter or buyer if there is reason to believe that:

(1) the timber buyer or timber cutter has acquired timber from a timber grower under a written contract for the sale of the timber without payment having been made to the timber grower as specified in the contract; or

(2) if:

(A) there is no written contract for the sale of the timber; or

(B) there is a written contract for the sale of the timber but the contract does not set forth the contract price for the timber;

the timber buyer or timber cutter has cut timber or acquired timber from the timber grower without payment having been made to the timber grower equal to the value of the timber as determined under IC 26–1–2.

. . . .

(f) The complaint served . . . to commence a proceeding under this section may seek the following:

. . . .

(2) Damages equal to three (3) times the stumpage value of any timber that is wrongfully cut or appropriated without payment.

The NRC affirmed the ALJ's findings and adopted his report as its final order. (R. 534). Tree Buyers petitioned the trial court for judicial review. (R. 534). The trial court held that a contract existed between Cowper and Tree Buyers, and therefore the NRC was not authorized to grant Cowper relief under the TBA. (R. 536). This appeal followed.

## Discussion and Decision

### Argument

Cowper contends that the trial court erred when it held that the NRC did not have authority to interpret the parties' contract. Specifically, Cowper argues two interwoven points which may be summarized as follows:

1. That IND.CODE § 25–36.5–1–3.2, specifically confers authority upon the NRC to afford the remedy provided; and

2. that the NRC's determination that there was no valid contract between the parties is a finding of fact supported by substantial evidence, and thereby not to be disturbed by the trial court.

We agree in part and disagree in part, addressing the above cited points in turn.

### Standard of Review

■ The party asserting the invalidity of an administrative agency's action bears the burden of establishing its invalidity. *Ad Craft, Inc. v. Board of Zoning Appeals of Evansville,* 693 N.E.2d 110, 113 (Ind.Ct. App.1998). When reviewing administrative decisions, the Court of Appeals applies the same standard of review as the trial court. *Coleman v. Indiana Family and Social Services Admin.,* 687 N.E.2d 366, 368 (Ind.Ct.App.1997). This standard of

review is set forth in IND.CODE § 4–21.5–5–14, and states in pertinent part as follows:

(d) The court shall grant relief ... only if it determines that a person seeking judicial relief has been prejudiced by an agency action that is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

IND.CODE § 4–21.5–5–14(d). However, the law is the province of the judiciary and the reviewing court is not bound by an agency's conclusions of law. *Weatherbee v. Indiana Civil Rights Com'n*, 665 N.E.2d 945, 947 (Ind.Ct.App.1996). Moreover, the construction of an unambiguous written contract is generally a question of law for the court. *Robinson v. Century Personnel, Inc.*, 678 N.E.2d 1268, 1270 (Ind.Ct. App.1997).

### NRC's Authority to Act

INDIANA CODE § 25–36.5–1–3.2 provides in pertinent part as follows:

(b) The department [NRC] may ... commence a proceeding against a timber cutter or buyer if there is reason to believe that:

(1) the timber buyer or timber cutter has acquired timber from a timber grower under a written contract for the sale of the timber without payment having been made to the timber grower as specified in the contract; or

(2) if:

(A) there is no written contract for the sale of the timber; or

(B) there is a written contract for the sale of the timber but the contract does not set 'forth the contract price for the timber;

. . . .

Therefore, the NRC may bring an action against a timber buyer if there is a contract between the buyer and grower and the contract is not paid according to the terms or the purchase price is not specified in the contract. Additionally, the NRC has the authority to act where no contract exists. Consequently, we turn our attention to the terms of the contract to determine the scope of the NRC's authority to act on behalf of Cowper.

### Contract Interpretation—Generally

■ Our supreme court has consistently expressed its commitment to advancing the public policy in favor of enforcing contracts. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind.1995). Moreover, Indiana courts recognize that it is in the best interest of the public not to unnecessarily restrict persons' freedom to contract. *Id.* Thus, as a general rule, the law allows persons of full age and competent understanding the utmost liberty in contracting; and their contracts, when entered into freely and voluntarily, will be enforced by the courts. *Schoemer v. Hanes and Associates*, 693 N.E.2d 1333, 1338 (Ind.Ct.App.1998). Accordingly, Indiana has long adhered to the rule that contracting parties may enter into any agreement they desire so long as it is not illegal or contrary to public policy. *Id.* It is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests. *Transcontinental Technical Services, Inc. v. Allen*, 642 N.E.2d 981, 983 (Ind.Ct.App. 1994).

### Analysis—Contractual Relationship Between Cowper and Timber Buyers

■ This contract dispute focuses upon the interpretation of the following two lines within the two page contract; *"18" and up on stump"* and *"TOTAL NUMBER OF TREES 18" IN DIAMETER OR GREATER IS 175 ...."* When interpreting a contract, the court's paramount goal

is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of the agreement. *Nation-sCredit Commercial Corp. v. Grauel Enterprises, Inc.,* 703 N.E.2d 1072, 1075 (Ind. Ct.App.1998) *trans. denied.* A written contract is presumed to embody the parties' entire agreement and merge within it all prior negotiations. *McCae Management Corp. v. Merchants National Bank and Trust Co. of Indianapolis,* 553 N.E.2d 884, 887 (Ind.Ct.App.1990). Where the parties have agreed to a specific term, an apparently inconsistent general statement must yield to the more specific term. *Fowler v. Campbell,* 612 N.E.2d 596, 600–601 (Ind.Ct.App.1993).

When appellate review of the disputed contract terms reveals no ambiguity we will not construe the contract or look to extrinsic evidence but will merely apply the contractual provisions. *Kiltz v. Kiltz,* 708 N.E.2d 600, 602 (Ind.Ct.App.1999) *trans. denied.* Moreover, the terms of a contract are not ambiguous merely because a controversy exists between the parties concerning the proper interpretation of the terms. *Tanton v. Grochow,* 707 N.E.2d 1010, 1013 (Ind.Ct.App.1999). The construction of an unambiguous written contract is generally a question of law for the court. *Robinson,* 678 N.E.2d at 1270. Here the parties' contract dispute was not a matter requiring the weighing of extrinsic evidence but rather was contained by its four corners, the interpretation and construction of which is a function for the court. *See Tanton,* 707 N.E.2d at 1013.

We find no ambiguity in the parties' contract, and construe the general statement of *"18" and up on stump"* as yielding to the specific limiting phrase of *"TOTAL NUMBER OF TREES 18" IN DIAMETER OR GREATER IS 175 ..."* Therefore, the trial court was correct in concluding that "there *was* a valid and legally enforceable two page written contract between the parties." (R. 536). However, this contract only covered 175 undamaged trees, and did not speak to the approximately 325 additional undamaged trees also acquired by Tree Buyers. Accordingly, we find that IND.CODE § 25–36.5–1–3.2(b)(2)(A) specifically confers authority upon the NRC to address Cowper's complaint regarding the timber acquired in excess of the number covered by the contract.

### Conclusion

The trial court was correct to hold that the TBA did not cover the parties' contract pertaining to the 175 undamaged trees for which Cowper was compensated. However, this determination did not remove the authority of the NRC to grant relief under the TBA with respect to those undamaged trees acquired in excess of 175, for which the parties had no agreement. Accordingly, we find Tree Buyers liable for those 325 undamaged trees acquired in excess of the parties' contract and remand to the NRC to determine damages.[1]

Reversed in part and remanded to the NRC to determine damages.

SULLIVAN, J., and GARRARD, J., concur.

1. The ALJ's original assessment of damages relied almost exclusively upon expert testimony to determine the fair market value of the undamaged trees acquired by Tree Buyers. (R. 203–07). In light of our decision that Cowper and Tree Buyers entered into a legally binding contract as to 175 undamaged trees, we remind the ALJ of the following pertinent findings:

    64. The TBA contains a provision, IC 25–36.5–1–3.2, that covers the cutting of timber without a contract and requires that payment be made to the timber grower in accordance with IC 26–1–2.

    65. IC 26–1–2–723 discusses market price and ways of establishing market price.

    66. The general definition of "market price" under the UCC involves a price determined between a willing buyer and willing seller, neither being under compulsion to buy or sell. See *Potts v. Offutt,* 481 N.E.2d 429 (Ind.App.1985).

(R. 203).