**CITY OF INDIANAPOLIS,**
**Appellant–Defendant,**

v.

**Randy L. BYRNS, Appellee–Plaintiff.**

No. 49A02–0009–CV–591.

Court of Appeals of Indiana.

April 9, 2001.

Gary Damon Secrest, Office of the Corporation Counsel, Indianapolis, IN, Attorney for Appellant.

Scott W. Montgomery, Montgomery & Edgar, Indianapolis, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

The City of Indianapolis ("the City") appeals the trial court's grant of summary judgment in favor of Plaintiff Randy L. Byrns, a recruit-trainee who claims he was unjustly terminated by the Indianapolis Police Department ("IPD") Training Academy ("the Academy"). We reverse and remand.

### Issue

We restate the sole issue presented by the City as whether the trial court erred when it granted Byrns' motion for summary judgment and ordered him reinstated to the IPD.

### Facts

The Academy accepted Byrns in September 1996, and he began his training the following month as a member of the 86th Recruit Class. The "86th Recruit Class Guidebook" established the training curriculum and performance areas requiring successful completion for graduation. The pertinent Guidebook language reads as follows:

*MERIT LAW*

**While the candidate is in the status of recruit trainee or probationary officer, the Chief of Police may terminate or temporarily suspend the candidate's employment with the Department for just cause. Such termination or suspension shall be made *without right to a hearing.***

Section 3–314, subsection (e); Code of Indianapolis and Marion County[.]

Record p. 80 (emphases in the original) (currently codified at Indianapolis Code § 253–203). The Guidebook further states:

*Notice of Sub Standard Performance*

After failing two examinations in the same performance area (See Recruit Guidebook Page 26), the Class Coordinator will serve the recruit officer with written notice of Sub–Standard Performance. It serves as documentation of the Recruit's deficiency in regards to Academy standards. A recruit officer failing a written or practical examination has the responsibility to seek remedial training in the deficient area.

Throughout training, recruit officers will be notified of their progress. Every effort will be made to assist the trainee in performing to the best of their ability. Should a recruit officer be given notice of Sub Standard Performance, counseling sessions will be available upon request to identify the problem(s). If a recruit trainee fails to meet academy and/or Department standards, the Director of Training will recommend that the recruit trainee be dismissed, in accordance with applicable law, from the Indianapolis Police Department Training Academy.

**Notice of Sub–Standard Performance serves as a warning to the trainee that dismissal may result from further failure(s).**

Record p. 81 (emphasis in the original). Page 26 of the Guidebook lists the following areas of performance that a recruit must successfully complete to meet the basic requirements of the Academy: Academics, Fitness Training/Defensive Tactics, Police Vehicle Operations, Firearms Proficiency, Practical Application Exercis-

es, General Discipline, and Performance Evaluation. On December 10, 1996, Byrns failed a written Criminal Law quiz. On December 17, 1996, he failed the written American Red Cross—CPR Exam.

On December 19, 1996, the Academy provided Byrns with the following notice of sub-standard performance:

Sir:

On December 10, 1996, you failed the Criminal Law exam with a score of 61. On December 17, 1996, you failed the American Red Cross CPR written exam with a score of 72. As Recruit Class Coordinator it is my responsibility to serve you with this notice of Sub Standard Performance.

In order to assist you in your successful completion of Academy training, the Training Staff offers remediation, re-testing and counseling when requested in writing.

However, as stated in the Recruit Guidebook on page 12, the Director of Training will recommend your dismissal in the event of any further failure to meet Academy or Departmental standards.

Supp. Record p. 101. On December 20, 1996, Byrns failed the written American Red Cross—ERC [1] Exam. In an interdepartment communication to acting IPD Chief Robert G. Allen, dated December 30, 1996, IPD Captain E. Tim Foley recommended Byrns' termination from the IPD. Before a decision was made as to his termination, Byrns signed a letter of resignation from the IPD on January 7, 1997. After unsuccessfully appealing to the Indianapolis Civilian Police Merit Board,[2]

Byrns filed a petition for judicial review and complaint for damages, alleging in pertinent part a count for breach of contract and a count for wrongful termination. On March 27, 2000, Byrns moved for summary judgment, designating inter alia a roster and "breakdown" of test scores of those in the 86th Recruit Class, interdepartmental communications regarding Byrns' resignation, several excerpts from the Guidebook, and Byrns' sworn affidavit. In his affidavit, Byrns averred in relevant part that he and four other recruits had been "forced to begin training one week later than the rest of the class"; that at the start of his training it "quickly became obvious that the instructors and administrators did not want us at the Academy"; and that the Academy administrators had "forced" him and the other late-starting recruits "to work many sixteen-hour days to 'catch up,' making it difficult to prepare for the following day's examinations." Record pp. 89–90. He further stated that on January 6, 1997, he had been informed by Sergeant Steve Goodwin that he "no longer had a job with IPD" and that when he returned IPD equipment the next day, Goodwin had ordered him to sign a resignation letter and refused his request to speak with the Chief of Police. *Id.* In this affidavit, Byrns also averred that Goodwin told him it would be impossible "to obtain any other type of employment" if the IPD fired him, and that he felt he "had no choice but to sign the letter of resignation" because Goodwin told him that if he did not sign it, he (Byrns) would not receive a receipt from IPD acknowledging his return of the equipment "valued at over $3000." Record p. 91.

---

**1.** ERC is an acronym for "Emergency Response Course."

**2.** On April 8, 1999, denying Byrns' request for a ruling that he was wrongfully terminated, the Merit Board issued its determination that

"the ordinance establishing the Police Merit Board and governing its powers and duties prescribes no role or responsibility for the Board with regard to the separation of employment of a recruit trainee." Record p. 78.

Byrns also designated findings of fact and conclusions of law dated January 11, 1999, entered in another division of the Marion Superior Court in the case of Thomas L. Vaughn, Jr., one of Byrns' classmates whose employment with the IPD was terminated in 1997. That trial court found Vaughn had been unjustly terminated because he had not failed three examinations in the same performance area. In its response to Byrns' summary judgment motion, the City also moved for summary judgment.

On May 15, 2000, the trial court conducted a hearing on the summary judgment motions. The parties stipulated to an exhibit showing numerous failures by other officers-in-training, of whom two were in Byrns' class. On May 23, 2000, the trial court issued findings and conclusions reading in pertinent part:

> 5. The Indianapolis Police Department, through the operation of the Training Academy and through the adoption and dissemination of its recruit class guidebook, set up a program whereby the recruit officer was permitted to have two failures in the same performance area, and the recruit officer would only be terminated after a third failure in the same performance area;
>
> 6. Randy L. Byrns failed a total of three examinations.... Byrns passed all other examinations that he took, including all retests offered on the previously failed examinations;
>
> 7. Randy L. Byrns' record shows that he never failed three (3) examinations in the same Performance Area, with the Criminal Law Quiz and the American Red Cross–CPR examinations falling under the purview of the "Academics" Performance Area and the American Red Cross–Emergency Response Course (ERC) falling under the purview

of the "Practical Application Exercises" Performance Area; and

> 8. Despite the foregoing, Randy L. Byrns was recommended for termination by then-Captain E. Timothy Foley, commander of the Academy, and asked to resign rather than be fired by then-Sergeant Steve Goodwin.

### CONCLUSIONS OF LAW

> 1. A valid written contract is created when a public employee begins the performance of his employment duties. *Lake County v. State ex rel. Manich,* 631 N.E.2d 529, 535 (Ind.Ct.App.1994); [other citation omitted];
>
> 2. The terms and conditions of the employment contract include all relevant statutory provisions as if such provisions were strictly set out in the contract. [citations omitted];
>
> 3. Indianapolis City Code Section 3–314 provides just cause protection to recruit officers such as Byrns. Specifically, the ordinance states in relevant part that, "While the candidate is in the status of recruit trainee or probationary officer, the chief of Police may terminate or temporarily suspend the candidate's employment with the Department for just cause.";
>
> 4. The contractual relationship of the parties as it relates to the claim in this lawsuit was governed by the 86th Recruit Class Guidebook as well as the policies and procedures of the Training Academy;
>
> 5. Since Byrns did not fail three examinations in the same performance area, and, although Byrns resigned from IPD, said resignation and termination of the employment contract was demanded by the Defendant and incorrectly predicated upon his failure of three examinations in none of the same specific performance

areas, and therefore, he was not terminated for just cause[;]

6. The constructive termination of Randy L. Byrns without just cause violates City Code Section 3–314;

7. The above and foregoing also constitute a breach of Byrns' employment contract with the City;

8. Summary judgment is appropriate for the moving party when there exists no genuine issue of material fact for a trier of fact to consider [citation omitted].

## JUDGMENT

The Court ... now finds that there exist[s] no genuine issue of material fact upon which the Defendant to rely [sic] in a presentation to the factfinder, and therefore enters judgment in favor of [Byrns] and against the [City]. Accordingly, Randy L. Byrns is hereby ordered reinstated to the [IPD]. Furthermore, the Court shall conduct a hearing on the amount of Byrns' damages, including his backpay and any other amounts to which he is legally entitled....

Record pp. 239–41. The City appeals.

### Analysis

■ The City argues that the trial court erred as a matter of law in concluding that Byrns had been terminated without just cause. In reviewing a trial court's ruling on a motion for summary judgment:

we apply the same standard as the trial court, and summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Although facts may not be in dispute, summary judgment is inappropriate if conflicting inferences arise from undisputed facts. On appeal, the appellant bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and the moving party was entitled to judgment as a matter of law.

*Reed v. Schultz,* 715 N.E.2d 896, 900 (Ind. Ct.App.1999) (citations omitted), *trans. denied.* Because a trial court's grant of summary judgment is "clothed with the presumption of validity," the City here bears the burden of demonstrating that the trial court erred. *See Kahrs v. Conley,* 729 N.E.2d 191, 193 (Ind.Ct.App.2000), *trans. denied.*

■ In his petition, as well as on appeal, Byrns has maintained the Guidebook provided that an officer-in-training would not be subject to termination by the Academy until he or she failed three tests in the same performance area. The City has consistently disagreed with this interpretation of the Guidebook, but has alternatively argued that even if the Guidebook is construed to require that all three failures be in the same performance area before a recruit is terminated, Byrns' three failures all fall under the "Academics" performance area because they were all on written examinations.

The Guidebook describes the "Academics" performance area in part as follows:

This instructional component is the area concerned with acquisition of knowledge necessary to function effectively and safely as a police officer. *The instruction deals with all aspects of job performance as a patrol officer,* and is directed in a linear progression of job knowledge and skills. *Measurement of proficiency is obtained through written examinations and assignments.*

*Testing Procedures*

Recruit officers are required to take all examinations....

1. A recruit officer must attain a minimum score of 70% or above on all

written examinations. (*The American Red Cross Exam* and Defensive Counter Measures Exam require 80% or above[.])

2. The recruit officer who fails two written examinations will be given written notice of Sub-[S]tandard Performance. The recruit will be counseled by an instructor to identify deficiencies. Notice of Sub Standard Performance provides fair warning to the recruit that dismissal may result from future academic failures.

3. The recruit officer who fails three examinations, including re-tests, will be recommended for dismissal from the recruit training program....

Record p. 141 (emphases added).

Although we are willing to assume for the sake of argument that Byrns had an employment "contract" with the City (as opposed to viewing his employment with the IPD as completely at-will), that fact alone is not dispositive and does not in itself entitle Byrns to reinstatement.[3] The parties agree that the Guidebook and the Indianapolis Code provide that recruit trainees can be terminated for "just cause." The fact that Byrns' relationship with the IPD may be described as "contractual" does not end the inquiry into whether the IPD had "just cause" to terminate him.

Viewing the relationship as "contractual" in nature, we must read the Guidebook as a whole, and give it its plain and ordinary meaning so as to harmonize all of its provisions, even those that appear conflicting. *See Eck v. Alusuisse,* 700 N.E.2d 1163, 1167 (Ind.Ct.App.1998), *trans. denied.* We find that when, as here, a recruit fails two examinations in the "Academics" performance area and then receives a "Notice of Sub–Standard Performance," as did Byrns, the Academy has "just cause" to terminate the recruit if he fails a third examination in the same performance area. That is the plain meaning of the Guidebook's advisement, "Notice of Sub–Standard Performance provides fair warning to the recruit that *dismissal may result* from future academic failures." Record p. 141 (emphasis added). We also find, after reviewing the definition of the "Academics" performance area, it contemplates any written examination as falling into that category, regardless of whether the subject of the examination might arguably also fall into another performance area. An example of this principle can be found in Byrns' own case: the second examination he failed was the American Red Cross CPR examination. CPR can certainly be characterized as a subject area encompassed by "Practical Application Exercises," but finding that its written examination component falls within the ambit of the "Academics" performance area is not mutually exclusive. The Guidebook's description of "Academics" clearly states that the performance area "deals with all aspects of job performance as a patrol officer." Record p. 141.

We further note that not only does the Guidebook contemplate the possibility of dismissal upon a third failure, but it also seems to contemplate the possibility of "just cause" termination arising from a *sole* failure in certain key areas. For example, in the section entitled "Areas of Performance for Academy Standards," under the heading "Practical Application Exercises," the Guidebook states in part, "failure to attain at least 70% on a practical exercise may result in the recruit's

---

3. We also note our supreme court's explicit rejection of the proposition that employee handbooks or guidelines create so-called unilateral contracts of employment. *See Orr v. Westminster Village North, Inc.,* 689 N.E.2d 712, 722 (Ind.1997).

dismissal from the Training Academy." Record p. 87. Additionally, the "General Discipline" and "Performance Evaluation" sections of the Guidebook do not mention the same "failure-notice-dismissal" protocol, but rather contain language such as "Disciplinary actions ranging from counseling, written reprimand, suspension from duty, to dismissal from the Department may be taken. *Violations will be handled on a case-by-case individual basis.*" Record p. 151 (emphasis added). The Guidebook's language provides several bases for "just cause" termination, but the following overarching rule is articulated in the "Merit Law" quoted in the Guidebook: "**the Chief of Police *may* terminate or temporarily suspend the candidate's employment with the Department for just cause.**" (bold-faced emphasis in the original; underscoring added). Byrns' contentions about other recruits who failed many more than three times in various performance areas are unavailing because of the discretionary aspect of the Merit Law. That is to say, the retention or dismissal of other recruits after failing certain exercises is clearly outlined as a discretionary function of the Academy training officers and the Chief of Police. However, even if "just cause" existed to terminate those other recruits, whether they were actually dismissed after that "just cause" determination is not pertinent to our review of Byrns' case. Our only concern is whether "just cause" existed in Byrns' case.

We note also the Guidebook's clear explanation of what is expected of recruit trainees. In the preface to the "Areas of Performance" section, the Guidebook states that its purpose is to provide "responsible, equitable rules, regulations, standards, policies, and procedural guidelines." Supp. Record p. 36. It also emphasizes:

> Standards and guidelines also provide the individual recruit with a clear guide to acceptable Departmental standards of performance and facilitate the orderly orientation to the training program.... **Our community will not tolerate unskilled and unintelligent regulation of our conduct, but rather demands professional service.... You will be expected to meet Academy standards in general performance of duties and skills. If you are unable to satisfactorily complete the Academy, you will be dismissed in accordance with applicable law.**

*Id.* (emphasis in the original). While we find it extremely disturbing that others in the Academy apparently failed to perform adequately in certain performance areas (as demonstrated by the exhibit to which both parties stipulated, showing that members of Byrns' class and other recruit classes had completed Academy training in spite of up to fourteen failures in various areas), such information is extraneous to our interpretation of what the Guidebook sets forth as "just cause" for termination. We do not know whether any of those trainees were given a "Notice of Sub Standard Performance" to serve as a "warning to the trainee that dismissal may result from further failure(s)," or whether other circumstances caused those recruits' situations to be handled differently on a "case-by-case" basis.

We find that although the Guidebook may in this instance be construed to allow three failures in one performance area before "just cause" for termination exists, we also agree with the City that because Byrns' third failure occurred on a written examination, it can and should be characterized as a failure in the "Academics" performance area. The Academy's handling of other recruits' failures is irrelevant, and the Academy had "just cause" to exercise its discretion to terminate Byrns.

Therefore, summary judgment in Byrns' favor is erroneous.

Finally, our review of all the evidence designated by both parties leads us to conclude that summary judgment in favor of the City is appropriate. The City has shown that there was "just cause" to recommend Byrns' termination and that the "Merit Law" found at Indianapolis Code Section 253–203 provides that when "just cause" exists, the "Chief of Police *may* terminate" a recruit trainee. We reiterate that this is a discretionary function of the Chief of Police (and, by extension, the Academy), and as long the threshold determination of "just cause" has been shown, we think it inappropriate for us to interfere in the Academy's relationship with its recruit trainees. Although the affidavits submitted with the City's summary judgment motion contain two officers' statements that the Academy has typically *not* required a recruit trainee's third failure to be in the same performance area as two previous failures, and that the Guidebook's provisions have been rigidly and uniformly applied, we conclude that the affidavits do not create a genuine issue of material fact, because we. have already concluded that the Academy's handling of other recruits' failures is. irrelevant to the "just cause" determination in Byrns' case. For his part, Byrns has not disputed that he failed three examinations; rather, his dispute was with the characterization of the third examination. Because we disagree with his characterization of the examination as a purely non-academic aspect of his training, we find no genuine issue of material fact precluding summary judgment in the City's favor.

### Conclusion

We find that because Byrns undisputedly failed three written examinations, all of which meet the Guidebook definition for examinations in the "Academics" performance area, the trial court erroneously granted summary judgment in Byrns' favor. We further find that Byrns' three failures amount to "just cause" for the Chief of Police and the Academy, in their discretion, to terminate Byrns' employment as a recruit trainee. Because Byrns has not demonstrated a genuine issue of material fact to overcome these determinations, summary judgment is appropriately granted to the City.

Reversed and remanded with instructions to enter summary judgment in favor of the City.

BAKER, J., and BROOK, J., concur.