**Brenda ZOLLMAN, Appellant–Defendant,**

v.

**GENEVA LEASING ASSOCIATES, INC., Appellee–Plaintiff.**

No. 49A04–0203–CV–135.

Court of Appeals of Indiana.

Dec. 20, 2002.

Joel E. Tragesser, Howard R. Cohen, Julia Blackwell Gelinas, Allison S. Avery, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellant.

R. Brock Jordan, John W. Graub, Rubin & Levin, P.C, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

This case arises from a complaint filed by Geneva Leasing Associates, Inc. ("Geneva") to enforce the terms of a personal guaranty signed by Brenda Zollman ("Brenda"). Following the trial court's grant of summary judgment in favor of Geneva, Brenda appeals. The sole dispositive issue presented for our review is whether Brenda contractually waived any defense to the enforceability of the guaranty by agreeing to release and discharge Geneva from any claims, liabilities, demands, damages, and causes of action.

We affirm.

## FACTS AND PROCEDURAL HISTORY[1]

On February 25, 1992, Zollgreen Limited Partnership ("the Partnership"), which was controlled by Charles Wallace Zollman ("Wally") and the owner of realty located in Marion County, entered into a loan agreement with Geneva, whereby Geneva agreed to lend the Partnership the sum of $3,200,000. To secure payment of the note, the Partnership executed a mortgage, an assignment of rents, a security agreement, a fixture filing, and a financing statement. Wally also executed a personal guaranty. The loan was to be repaid in full no later than February 25, 1997.

Between 1992 and 1996, the parties amended the original loan agreement, note, and mortgage several times. Prior to the payment deadline, Wally informed Geneva that neither he nor the Partnership had the funds available to repay the loan. Accordingly, Wally requested a one-year extension of the payment deadline. Geneva, concerned about extending the payment deadline, required Wally to provide an updated financial statement in order to assess his creditworthiness and determine whether Wally's personal guaranty adequately protected its position. Wally provided a financial statement dated December 31, 1996, and, based upon the information contained therein, Geneva decided to extend the payment deadline only if it obtained additional security for repayment. This decision was apparently based upon the following factors: 1) The Partnership operated at a net loss for 1995; 2) Wally personally owned less than $100,000 in stocks and bonds that could be liquidated to repay the note pursuant to the terms of the personal guaranty; and 3) the liquidation value of artwork owned by Wally was speculative and already

served as collateral to Huntington National Bank.

The financial statement disclosed that Wally owned a 50% ownership interest in $930,000 worth of real estate, including a personal residence and realty located in Brown County, Indiana, and Pinal County, Arizona. Brenda, who is Wally's spouse, owned the other 50% interest. Geneva therefore agreed to extend the payment deadline to February 25, 1998, on the condition that Brenda execute a personal guaranty. On April 23, 1997, Brenda executed her absolute and unconditional guaranty. The payment deadline was again extended to February 25, 2000, after the Partnership and the Zollmans were unable to satisfy the outstanding obligation. On February 25, 1998, Brenda executed a document entitled "Fourth Amendment to Loan Agreement," which contained the following release provision:

> *RELEASE.* BORROWER AND GUARANTOR [COLLECTIVELY, THE "RELEASING PARTIES"] ... HEREBY JOINTLY AND SEVERALLY RELEASE AND DISCHARGE LENDER ... FROM ANY AND ALL CLAIMS, LIABILITIES, DEMANDS, DAMAGES AND CAUSES OF ACTION WHICH ANY OF THE RELEASING PARTIES HAS ASSERTED OR CLAIM OR MIGHT NOW OR HEREAFTER ASSERT OR CLAIM AGAINST ANY OF THE RELEASED PARTIES, WHETHER KNOWN OR UNKNOWN, ARISING OUT OF, RELATING TO, OR IN ANY WAY CONNECTED WITH ANY PRIOR RELATED EVENT (AS SUCH TERM IS HEREIN DEFINED). AS USED IN THIS AGREEMENT, THE TERM "PRIOR RELATED EVENT" SHALL MEAN ANY ACT, OMISSION, CIR-

---

1. We heard oral argument in this case on September 24, 2002, in Indianapolis and commend counsel for the quality of their appellate advocacy.

CUMSTANCE, AGREEMENT, LOAN, EXTENSION OF CREDIT, TRANSACTION, EVENT, ACTION OR OCCURRENCE BETWEEN OR INVOLVING ALL OR ANY OF THE RELEASING PARTIES AND ALL OR ANY OF THE RELEASED PARTIES, MADE, EXTENDED OR OCCURRING AT ANY TIME OR TIMES PRIOR TO THE EXECUTION OF THIS AGREEMENT, AND WHICH WAS RELATED TO, BASED UPON OR IN ANY WAY CONNECTED WITH, DIRECTLY OR INDIRECTLY, ANY OF THE OBLIGATIONS, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR UNDERTAKEN PURSUANT THERETO OR IN CONNECTION THEREWITH . . . .

*Appellee's Appendix* at 157–58. On the same date, Brenda also executed a separate consent, entitled "Brenda's First Consent of Guarantor" in which she agreed to the provisions of the Fourth Amendment to the loan agreement.

Events of default as defined in the loan agreement occurred prior to the payment deadline, and Geneva accelerated the outstanding balance of the note. On February 26, 1999, Geneva filed suit against the Partnership and the Zollmans, claiming entitlement to the collateral securing the note. The Partnership and Wally filed a bankruptcy petition in March 1999. All proceedings were subsequently stayed against Wally. Geneva proceeded against Wally, *in rem*, after the bankruptcy court lifted the stay for the specific purpose of allowing Geneva to obtain an *in rem* judgment against him. On July 12, 2001, the trial court granted Geneva a foreclosure judgment in the amount of $3,081,781.61 plus attorney's fees. This judgment was partially satisfied in the amount of $1,627,000 following a sheriff's sale.

Geneva filed a motion for summary judgment against Wally, in rem, and Brenda, in personam. Following a hearing on February 14, 2002, the trial court granted summary judgment in favor of Geneva and against Wally, in rem, and Brenda, in personam, in the amount of $1,642,951.78, plus attorney's fees and costs. Brenda now appeals.

## DISCUSSION AND DECISION

■ In response to Geneva's summary judgment motion, Brenda argued that by automatically requiring her to sign the personal guaranty, Geneva violated the Equal Credit Opportunity Act ("ECOA").[2] Geneva maintained that it did not automatically require Brenda to execute the personal guaranty, but instead obtained the

2. Under the Equal Credit Opportunity Act, 15 U.S.C. § 1601 *et seq.* ("ECOA"), and its implementing regulations, 12 C.F.R. § 202.1 *et seq.*, a commercial lender is prohibited from requiring a spousal guaranty on a note when the applicant individually qualifies for the loan. Specifically, 15 U.S.C. § 1691(a) makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, . . . on the basis of . . . marital status." Regulation B of the Board of Governors of the Federal Reserve System, which is the implementing regulation of the ECOA, specifically provides: "Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1). Further, 12 C.F.R. § 202.7(d)(5) provides:

> If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the extension of the credit requested, a creditor may request a consignor, guarantor, or the like. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.

guaranty only after it reviewed the 1996 financial statement from Wally and determined that his personal guaranty was insufficient to protect its position. Geneva alleged that it complied with the ECOA because it determined that Wally was not independently creditworthy prior to having Brenda execute the personal guaranty for the requested extension of the loan repayment date. Geneva further maintained that by signing the release, she expressly waived reliance upon an ECOA violation as a defense to the action against her.

We agree with Geneva that Brenda has contractually waived her defense. We do not reach the issue of whether an ECOA violation occurred, because we find dispositive the fact that Brenda waived any ECOA claim or defense by executing both the Fourth Amendment to the Loan Agreement and the separate consent.

Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *I/N Tek v. Hitachi Ltd.*, 734 N.E.2d 584, 586 (Ind. Ct.App.2000), *trans. denied*. If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Gilman v. Hoh-*

*man*, 725 N.E.2d 425, 428 (Ind.Ct.App. 2000), *trans. denied*. Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *City of Indianapolis v. Byrns*, 745 N.E.2d 312, 316 (Ind.Ct.App.2001). On appeal, we are bound by the same standard as the trial court, and we consider only those matters that were designated at the summary judgment stage. *Interstate Cold Storage v. General Motors Corp.*, 720 N.E.2d 727, 730 (Ind.Ct.App. 1999), *trans. denied*. We do not reweigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Estate of Hofgesang v. Hansford*, 714 N.E.2d 1213, 1216 (Ind.Ct.App.1999). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied*.

■ Indiana courts have a lengthy tradition of recognizing and respecting the freedom to contract. Our supreme court has consistently expressed its commitment to advancing the public policy supporting enforcement of contracts. *See Trimble v. Ameritech Publ'g, Inc.*, 700 N.E.2d 1128, 1129 (Ind.1998); *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind.1995); *Candlelight Props. LLC v. MHC Operating Ltd. Partnership*, 750 N.E.2d 1, 10 (Ind.Ct.App. 2001), *trans. dismissed*. "We recognize a 'very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties.'" *Trotter v. Nelson*, 684 N.E.2d 1150, 1152 (Ind.

1997) (quoting *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters. Inc.,* 669 N.E.2d 134, 139 (Ind.1996)). This is based upon the principle that it is in the best interest of the public for courts not to unnecessarily restrict persons' freedom to contract. *Candlelight Props.,* 750 N.E.2d at 10; *Peoples Bank & Trust Co. v. Price,* 714 N.E.2d 712, 716 (Ind.Ct.App.1999), *trans. denied.*

Therefore, as a general rule, the law allows competent adults the utmost liberty in entering into contracts that, when entered into freely and voluntarily, will be enforced by the courts. *Candlelight Props.,* 750 N.E.2d at 10; *Peoples Bank & Trust Co.,* 714 N.E.2d at 716 (citing *Fed. Kemper Ins. Co. v. Brown,* 674 N.E.2d 1030, 1033 (Ind.Ct.App.1997), *trans. denied* ). Further, Indiana has long allowed contracting parties to enter into any agreement they desire so long as it is not illegal or against public policy. *Cowper v. Collier,* 720 N.E.2d 1250, 1255 (Ind. Ct.App.1999).

When reviewing a contract on appeal, our standard of review is also well settled. If the language of the instrument is unambiguous, the intent of the parties is determined from its four corners. *Stemm v. Estate of Dunlap,* 717 N.E.2d 971, 975 (Ind.Ct.App.1999). A contract is ambiguous only where a reasonable person could find its terms susceptible to more than one interpretation. *Id.* Further, "[i]t is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests." *Cowper,* 720 N.E.2d at 1255.

Here, we are faced with examining a release provision contained in a guaranty agreement. We note that the interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. *Prall v. Indiana Nat'l Bank,* 627 N.E.2d 1374, 1377 (Ind.Ct.App.1994). Absent some ambiguity, release agreements are interpreted as a matter of law. *Id.* In the absence of ambiguity, we look only to the instrument to ascertain the parties' intent. *Id.* We ascertain the intent of the parties at the time the contract was entered by examining the words used in the agreement to express the parties' respective rights and duties. *Citizens Nat'l Bank of Tipton v. Indianapolis Auto Auction,* 592 N.E.2d 1256, 1258 (Ind.Ct.App.1992). If the contract is ambiguous and the ambiguity arises from extrinsic facts and a genuine issue exists as to those facts, summary judgment is inappropriate. *Prall,* 627 N.E.2d at 1377.

Although we find no Indiana contract case interpreting a waiver and release provision contained in a guaranty contract, we are guided by caselaw addressing release agreements in general. A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. *Id.* (citing *Lechner v. Reutepohler,* 545 N.E.2d 1144, 1147 (Ind.Ct.App.1989)). "Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes." *Id.* (citing *Indiana Bell Tel. Co., Inc. v. Mygrant,* 471 N.E.2d 660, 664 (Ind. 1984)). The purpose of a release is to foreclose further claims. *Id.*

In the present case, Brenda does not contend that the release provision is ambiguous or that she agreed to it under economic duress, fraud, or mistake. Indeed, there is no evidence in the record before us on appeal that the bargaining between the parties was anything other than free and open. Moreover, the facts establish that Brenda was a sophisticated

party and was represented by legal counsel during the negotiation of the guaranty agreement. She had the opportunity to receive legal advice prior to executing the amendment and consent and presumably executed the instruments after reading and understanding their terms, including the release provision. Thus, in interpreting the release we will look to language of the instrument to determine intent. Here, the plain language of the release provision stated that Brenda was waiving her right to pursue any claims or demands. The language of the contractual release is clear. Accordingly, given that Brenda released and discharged Geneva from any liability, she cannot now attempt to raise the ECOA as an affirmative defense.

"If judges could interpret a release to mean something that is contrary to the plain language because one party intended for it to mean something else, then parties would be discouraged from signing releases because they could not have confidence that a court would enforce the release's plain language." *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1275 (Ind.Ct. App.2001). Our paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of the agreement. Given that we may not rewrite the contract for the parties and will apply contractual provisions according to their plain language, we conclude that the release provision is fully applicable and that the trial court properly granted Geneva's motion for summary judgment.

Affirmed.

DARDEN, J., concurs.

BROOK, C.J., concurs with separate opinion.

BROOK, Chief Judge, concurring in result.

I respectfully disagree with the majority's conclusion that Brenda waived her affirmative defense of illegality with respect to Geneva's action on her personal guarantee. Because I believe that Brenda has failed to establish the existence of a genuine issue of material fact, however, I would affirm the trial court's grant of summary judgment for Geneva.

When Brenda signed the Fourth Amendment to the Loan Agreement, she agreed to release Geneva from any and all "CLAIMS, LIABILITIES, DEMANDS, DAMAGES AND CAUSES OF ACTION[.]" The majority summarily concludes that Brenda thereby waived her right to raise affirmative defenses to a claim brought by Geneva. I cannot agree with this conclusion.[3] Simply put, Brenda waived her rights to sue Geneva, file a counterclaim against Geneva, or file a claim against a third party; she did *not* waive her right to interpose affirmative defenses to a claim brought by Geneva. As such, I would address the merits of Brenda's appeal.

---

**3.** A "claim" may be defined as "[t]he assertion of an existing right." BLACK'S LAW DICTIONARY 240 (7th ed.1999). A "liability" may be defined as a "legal responsibility to another ... enforceable by civil remedy[.]" *Id.* at 925. A "demand" may be defined as "[t]he assertion of a legal right." *Id.* at 441. "Damages" may be defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury[.]" *Id.* at 393. "Cause of action" may be defined as

"[a] group of operative facts giving rise to one or more bases for suing[.]" *Id.* at 214.

In contrast, an "affirmative defense" is "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the *plaintiff's ... claim,* even if all allegations in the complaint are true." *Id.* at 430 (emphasis added). It is also worth noting that Indiana Trial Rule 8 addresses "Claims for Relief" and "Affirmative defenses" separately.

I believe that Brenda has failed to establish a genuine issue of material fact with respect to Geneva's claim or her affirmative defense of illegality and would affirm the trial court on that basis. In his affidavit, Slade listed the "factors" that led Geneva to determine that Wally was uncreditworthy and affirmed that "Geneva was willing to extend the due date for the Note only if Geneva obtained additional security for repayment." *See* Appellant's App. at 35. This uncontradicted evidence establishes that Wally did not qualify under Geneva's standards of creditworthiness. As such, Geneva was permitted under Regulation B to require Brenda's signature before granting Wally's extension.