Richard D. **KRUSE**, Appellant–
Defendant,

v.

The **NATIONAL BANK
OF INDIANAPOLIS**,
Appellee–Plaintiff.

No. 49A05–0401–CV–20.

Court of Appeals of Indiana.

Sept. 21, 2004.

R. Brock Jordan, Gene A. Wheeler, Rubin & Levin, P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Richard D. Kruse, guarantor of indebtedness arising from a loan from National Bank of Indianapolis ("NBI" or "Lender" or "the Bank") to SignTec, LLC ("Sign-Tec" or "Borrower" or "the Company"), appeals, arguing that genuine issues of material fact should have precluded the trial court's entry of summary judgment in favor of NBI. We find that because Kruse signed an "absolute, unconditional and continuing" Guaranty providing for "unlimited" liability and the waiver of various defenses—including claims that the Bank extended the loan's maturity date without Kruse's consent and failed to notify Kruse of Borrower's noncompliance with the loan's financial reporting requirements—Kruse's unsubstantiated allegations as to the Bank's alteration of and Borrower's failure to comply with the underlying loan agreement will not discharge his liability. Moreover, we find that NBI's conduct did not breach any existing fiduciary duty or implied duty of good faith. Given these conclusions, we affirm the trial court's entry of summary judgment in favor of NBI and remand to the trial court with instructions to determine the amount of appellate attorneys' fees to be added to NBI's judgment.

### Facts and Procedural History[1]

On March 28, 2001, NBI notified Sign-Tec, an Indiana limited liability company, that it had approved the Company's loan

Carl R. Pebworth, Shawna Meyer Eikenberry, Baker & Daniels, Indianapolis, IN, Attorneys for Appellant.

1. Oral argument was held in our courtroom on August 20, 2004. We thank counsel for their commendable presentations, which assisted us in the determination of this case.

request. This notification came in the form of a Commitment Letter and Loan Agreement ("the Loan Agreement"), in which NBI agreed to make loans available to SignTec in an amount *not to exceed the lesser of* (a) $500,000 or (b) that amount equal to the sum of eighty percent (80%) of SignTec's accounts receivable that are less than ninety (90) days old ("the Borrowing Base"). Appellant's App. p. 21. The Loan Agreement further provided: "Within thirty (30) days after the end of each month, [SignTec] shall provide to the Bank a certificate evidencing the Borrowing Base in a form satisfactory to the Bank (the "Borrowing Base Certificate")," in addition to various other financial reporting requirements. Appellant's App. p. 21, 23. If at any time the principal amount outstanding exceeded the Borrowing Base, the terms of the Loan Agreement required SignTec to immediately repay NBI the amount in excess of the Borrowing Base. The loan was to expire on March 28, 2002, at which time the entire unpaid principal balance plus all accrued interest was to become due, and the loan was to be evidenced by a promissory note in the principal amount of $500,000. NBI secured the loan with a first security interest in SignTec's accounts receivable and other assets. Three Guarantors, including Kruse, signed the Loan Agreement on March 29, 2001.

Each of the Guarantors, including Kruse—"a member of SignTec [and holder of] a minority interest in [SignTec]," Appellant's App. p. 142—also signed separate Guaranty forms dated March 29, 2001. The Guaranty states:

> [T]he Undersigned hereby absolutely and unconditionally guarantees to [NBI] the full and prompt payment when due ... of the debts, liabilities and obligations described as follows:
>
> **A.** If this [checked box] is checked, the Undersigned guarantees to [NBI] the payment and performance of the debt, liability or obligation of [SignTec] to [NBI] evidenced by or arising out of the following: *Note for $500,000 DTD 3/29/01; Maturing 3/28/02* and any extensions, renewals, or replacements thereof (hereinafter referred to as the "Indebtedness").

Appellant's App. p. 35. The Guaranty also states, "This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness and shall continue to be in force and be binding upon the Undersigned ... until this guaranty is revoked by written notice...."[2] *Id.* Further, the

---

**2.** "An absolute guaranty is a guaranty whereby the guarantor agrees to answer for the debt of the debtor, notwithstanding the occurrence or nonoccurrence of any event either within or not within the contemplation of the parties at the time the guaranty is executed." Peter A. Alces, *The Law of Suretyship and Guaranty*, § 1:4 (2003) (footnote omitted).

As to "absolute" or "unconditional" guaranties, another panel of this Court—looking to federal courts for guidance—explained:

> Contracts of guaranty are divided into two kinds. One is absolute or unconditional and the other is conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice.... An absolute guaranty, unlike a conditional one, casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor.... Both presuppose default by the principal.

*McEntire v. Ind. Nat'l Bank*, 471 N.E.2d 1216, 1225 (Ind.Ct.App.1984) (citations omitted), *reh'g denied, trans. denied.*

And finally, there is the "continuing guaranty": "When the creditor and the debtor contemplate a continuing creditor-debtor relationship, the creditor will require that the guarantor provide a continuing guaranty.... In this situation, a guaranty may be renewed or extended without the guarantor's knowl-

Guaranty provides that the liability of the Undersigned shall be limited to a principal amount of "$ *UNLIMITED* (if unlimited ... the Undersigned shall be liable for all Indebtedness, without limitation as to amount), plus all accrued interest thereon and all attorneys' fees, collection costs and enforcement expenses referable thereto." *Id.* at 35. Finally, the Guaranty states:

> 6.... The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): ... (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness....

*Id.* at 113.

On March 28, 2002—the original date of maturity—NBI approved an amendment to the Loan Agreement extending the maturity date to June 1, 2002. The Guarantors and Sean B. Kearns, on behalf of NBI, signed this First Amendment to Commitment Letter and Loan Agreement. On June 1, 2002, NBI issued a Second Amendment and Commitment Letter, which was signed by Kearns but not by the Guarantors. In this Second Amendment, NBI extended the loan's maturity date to May 1, 2003.

edge." Alces, *supra,* at § 1:6 (footnotes omit-

SignTec filed for Chapter 11 Bankruptcy in December 2002. On January 27, 2003, NBI sent the Guarantors, including Kruse, a letter notifying them that SignTec was in default under the Note and Loan Agreement by virtue of, among other things, failure to provide NBI with the required financial statements and insolvency. The letter demanded payment in full of Sign-Tec's indebtedness to NBI in the amount of $499,165.35 as of the date of the letter, plus interest thereafter at the per diem rate of $58.52.

On April 24, 2003, NBI filed a Complaint on Guaranties, naming all three Guarantors as defendants. NBI then filed a motion for summary judgment, designated evidentiary materials, and a supporting memorandum.

On June 23, 2003, Kruse filed his Answer to the initial complaint, alleging that NBI's claims are barred on various grounds best summarized by Kruse's "Eighth Defense":

> The Bank's claims are barred in whole or in part because and to the extent that the Bank has failed to inform Kruse of [SignTec]'s misconduct, permitted a material alteration of the underlying obligation with[out] Kruse's consent, impaired the collateral securing the underlying indebtedness, or otherwise breached the Bank's duty to deal with Kruse fairly and in good faith.

*Id.* at 67. Thereafter, Kruse filed his Response to NBI's motion for summary judgment, a designation of evidentiary materials and material issues of fact, and a supporting memorandum that cites heavily to an attached affidavit of Richard D. Kruse.

NBI subsequently filed a Motion to Amend Complaint by Interlineation and Addendum of Exhibit to include the re-

ted).

verse side of the Guaranty, which—due to a clerical error—had not been attached to NBI's complaint; a Notice of Filing' Supplemental Affidavit and Designation, which included the supplemental affidavit of NBI Assistant Vice President Sarah G. Hanover, who authenticated Exhibit "H" to the amended complaint as the reverse side of each of the Guaranty forms signed by the Guarantors; a Motion to Strike Affidavit of Richard D. Kruse in Opposition to Summary Judgment; and a Reply Memorandum in Support of Motion for Summary Judgment.

In response, Kruse filed a Supplemental Affidavit of Richard D. Kruse; a memorandum in response to NBI's motion to strike his original affidavit; a surreply to NBI's reply to Kruse's response to NBI's motion for summary judgment; and an amended designation of evidence and material facts in response to NBI's motion for summary judgment.

NBI countered with a reply to Kruse's response to NBI's motion to strike Kruse's original affidavit, and a reply to Kruse's amended designation of evidence and material facts in response to NBI's motion for summary judgment.

On December 2, 2003, the trial court entered an order granting NBI's motion to strike Kruse's original affidavit; the order made no mention of Kruse's supplemental affidavit. On the same date, the trial court also entered summary judgment in favor of NBI in the amount of $496,447.90, plus costs.

Kruse now appeals.

**3.** Kruse also appeals the trial court's order striking his original affidavit. Typically, we would consider whether the trial court abused its discretion in striking the affidavit. Given today's holding, however, we need not reach

## Discussion and Decision

Kruse appeals the trial court's entry of summary judgment in favor of NBI.[3] In reviewing a decision upon a summary judgment motion, we apply the same standard as the trial court: summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *see Fort Wayne Lodge, LLC v. EBH Corp.*, 805 N.E.2d 876, 882 (Ind.Ct.App.2004). The moving party bears the burden of showing prima facie that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law; once this burden has been met, the non-moving party must respond by setting forth specific facts demonstrating a genuine need for trial and cannot rest upon the allegations or denials in the pleadings. *See Fort Wayne Lodge, LLC*, 805 N.E.2d at 882.

On appeal, the trial court's grant of a motion for summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of persuading the appellate tribunal that the grant of summary judgment was erroneous. *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 391 (Ind. Ct.App.2002). We do not reweigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Id.* A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.*

this question since we find there is no genuine issue of material fact precluding summary judgment even if we consider Kruse's original affidavit in its entirety.

Kruse raises seven issues on appeal, which we consolidate and restate as follows:

(1) Do material issues of fact concerning the debt Kruse guaranteed preclude summary judgment?

(2) Did NBI have a duty to fully disclose SignTec's alleged misconduct and, if so, does NBI's alleged failure to do so raise a genuine issue of material fact?

(3) Did NBI breach an existing fiduciary duty and implied duty of good faith owed to Kruse?

(4) Should equitable estoppel bar NBI's recovery from Kruse on the ground that NBI induced Kruse to believe that his consent would be sought for future maturity date extensions?

(5) Was there a material alteration of the terms of the underlying debt and, if so, does this alteration affect Kruse's liability under the Guaranty?

(6) Did NBI fail to mitigate its damages, and, if so, does this failure raise a genuine issue of material fact as to Kruse's liability?

We consider each issue in turn. We then consider NBI's claim of entitlement to appellate attorneys' fees.

4. NBI claims that Kruse failed to raise this issue when opposing NBI's motion for summary judgment and has thus waived appellate review. Waiver notwithstanding, we prefer, when necessary, to reach the merits of a given issue. Given the pivotal nature of this issue—which involves the interpretation of the documents around which this entire case revolves—we have opted to do so here.

5. The only document in evidence called a "Note" is dated June 1, 2002, and has a maturity date of May 1, 2003. Appellant's App. p. 33. Essentially, the Note states that the NBI loan is "Open End Credit" subject to the following Conditions for future advances:

## 1. Material Issues of Fact Concerning the Debt Kruse Guaranteed[4]

 Kruse argues first: "A review of the documents that NBI designated in the trial court reveals ambiguities about what debt Kruse allegedly guaranteed and whether Kruse is liable under the guaranty that NBI has placed in the record." Appellant's Br. p. 13. In particular, Kruse attempts to make much of the fact that the Guaranty he signed on March 29, 2001, does not refer to the Loan Agreement; instead, the Guaranty refers to a "Note for $500,000.00 DTD 3/29/01; Maturing 3/28/02," but no Note with this date has been placed into evidence.[5] Appellant's App. p. 35. Hence, Kruse argues, there are ambiguities as to what debt he guaranteed. We find that there is no genuine issue of material fact as to what debt Kruse guaranteed.

 We initially observe that the interpretation of a guaranty is governed by the same rules applicable to other contracts. *Noble Roman's, Inc., v. Ward,* 760 N.E.2d 1132, 1137–38 (Ind.Ct.App.2002). In construing a guaranty, this Court must give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of the surrounding circumstances. *Id.* at 1138. Generally, the nature and extent of a guar-

"Telephone requests subject to the terms and conditions of the Commitment Letter and Loan Agreement Dated 3/28/01 Amended 3/28/02 and 6/01/02." H. Milton Stewart, but not Kruse, signed this Note. *Id.* We can reasonably infer that the June 1, 2002, Note for $500,000 is simply an extension, renewal or replacement—to which Kruse explicitly consented in his Guaranty—of a June 1, 2001, Note for $500,000 that did not make it into the record. It is also worth noting that Kruse himself—throughout both of his affidavits—refers to the Loan Agreement as the "Accounts Receivable Note." *See, e.g.,* Appellant's App. p. 143.

antor's liability depends upon the terms of his contract, and a guarantor cannot be made liable beyond the terms of the guaranty. *Id.* However, the terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within their terms. *Id.* Moreover, writings executed at the same time and relating to the same transaction or subject matter will be construed together in determining the intent underlying the contracts. *Id.* Put another way, the guaranty and any other written agreements it incorporates must be construed together in order to determine the parties' intentions. *Id.*

It is clear from the face of the Loan Agreement and the Guaranty—both of which are signed by Kruse—that Kruse agreed to act as a Guarantor of SignTec's Indebtedness to NBI as evidenced by a promissory note in the principal amount of $500,000. Indeed, even aside from the reference to a note for $500,000 in the separate Guaranty, Kruse is one of the three Guarantors named within the body of the Loan Agreement itself. Appellant's App. p. 22. Furthermore, in his original affidavit, Kruse admits, "On or about March 29, 2001, contemporaneously with the execution of the Accounts Receivable Note, I executed a guaranty in which I guaranteed payment of the debt, liability or obligation of SignTec to NBI evidenced

by and arising out of 'Note for $500,-000....'"[6] *Id.* at 96. Thus, we reject Kruse's claim that there is a genuine issue of material fact as to what debt he guaranteed.

## 2. NBI's Alleged Duty to Notify Kruse of SignTec's Alleged Misconduct

■ Kruse next asserts that there is a genuine issue of material fact as to whether NBI failed to fully notify Kruse of SignTec's misconduct under the Loan Agreement. To support this proposition, Kruse quotes from *Indiana Telco Federal Credit Union v. Young:* "It is [ ] well established that a creditor's failure to notify a surety of a debtor's misconduct discharges the surety." *Indiana Telco,* 156 Ind.App. 483, 297 N.E.2d 434, 435 (1973). Kruse also cites *Yin v. Society National Bank Indiana,* in which a different panel of this Court reversed a summary judgment in favor of the creditor after determining that there were genuine issues of material fact as to, among other things: whether the creditor had discovered facts unknown to the guarantors that would have given the guarantors the option of terminating their obligation to the creditor; whether the creditor had reason to believe that the guarantors did not know of these deviations; and whether the creditor had a reasonable opportunity to communicate these deviations to the guaran-

---

**6.** Given this admission, we simply do not know what to make of Kruse's later assertion in Paragraph 12 of his supplemental affidavit that "Plaintiff's Exhibit E is not a true and accurate copy of any guaranty that I have executed." Appellant's App. p. 144. The document is clearly signed by Kruse and Kruse does not challenge the authenticity of the signature. Additionally, Kruse did not offer into evidence any other document that he will admit is a true and accurate copy of the Guaranty. Presumably he is attempting to imbue with significance the fact that the reverse side (or "page 2") of the Guaranty was

not initially—due to a clerical error—attached to NBI's complaint. NBI remedied this problem, however, with a Motion to Amend Complaint by Interlineation and Addendum of Exhibit to include the reverse side of the Guaranty as Exhibit "H." *Id.* at 114. NBI also filed a Notice of Filing Supplemental Affidavit and Designation, which included the supplemental affidavit of NBI Assistant Vice President Sarah G. Hanover, who authenticated Exhibit "H" to the amended complaint as the reverse side of each of the Guaranty forms signed by the Guarantors. *Id.* at 109.

tors. *Yin,* 665 N.E.2d 58, 65 (Ind.Ct.App. 1996), *reh'g denied, trans. denied.* Interestingly, the *Yin* court also disagreed with the *Indiana Telco* proposition cited above. *See id.* at 64–65 ("[W]e agree with [the creditor] that a creditor's mere failure to notify the surety of a debtor's misconduct does not automatically discharge the surety.").

NBI maintains that it was under no duty to notify Kruse of SignTec's alleged misconduct: "It is well established in Indiana that a guarantor is not entitled to notice of his principal's default when his undertaking to answer for his principal's debts and obligations is absolute." *Bowyer v. Clark Equip. Co.,* 171 Ind.App. 431, 357 N.E.2d 290, 293 (1976). "However, when the guaranty is collateral and the liabilities guaranteed have not been created and are uncertain in amount, the creditor is required to give notice of the principal's default." [7] *Id.* And yet, "There is no question that a guarantor may expressly waive his right to notice of his principal's default." *Id.* at 294.

NBI contends that it had no duty to notify Kruse of SignTec's alleged misconduct because (1) Kruse was an absolute, rather than a collateral, guarantor, and (2) Kruse expressly waived any right he may have had to notice of SignTec's default. In support of the first contention, NBI quotes from the Guaranty, signed by Kruse, which states,

> [T]he Undersigned hereby *absolutely* and *unconditionally* guarantees to [NBI] the full and prompt payment

when due ... of the debt, liability, or obligation of [SignTec] to [NBI] evidenced by or arising out of the following: NOTE FOR $500,000.00 DTD 3/29/01; MATURING 3/28/02 and any extensions, renewals or replacements thereof (hereinafter referred to as the "Indebtedness").

Appellant's App. p. 35 (emphasis supplied). In support of the second contention, NBI quotes language contained in Paragraph 6 of the reverse side (Exhibit "H") of the Guaranty signed by Kruse:

> The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which [NBI] is expressly authorized to do, omit or suffer from time to time ... *without notice to or approval by the Undersigned*): ... (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to [SignTec], any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness....

*Id.* at 113 (emphasis supplied).

Thus, the caselaw and the terms of the Loan Agreement and Guaranty signed by Kruse support both of NBI's contentions: Kruse was not entitled to notice of SignTec's default or alleged "misconduct" both because he was an absolute guarantor and because he expressly waived his right to such notice. Moreover, Kruse admits in

---

**7.** Although the *Bowyer* court does not explicitly distinguish "collateral" and "absolute" guarantors, the court does write:

> In the case at bar, Bowyer, as guarantor, agreed to be responsible for any liabilities incurred by Emry upon its default. At the time this guarantee contract was made, Emry had not yet been incorporated and its liabilities to the creditor were unknown,

indefinite and no specified payment date was established. Therefore, Bowyer held the status of a collateral guarantor rather than an absolute guarantor and was entitled to notice of his principal's default if in fact he did not expressly waive this right to notice.

*Bowyer,* 357 N.E.2d at 293.

his original affidavit [8] and his supplemental affidavit [9] that NBI *did* notify him that SignTec was not in full compliance with the requirements of the Loan Agreement. Thus, we find that Kruse has not shown that there is a genuine issue of material fact as to whether NBI breached an existing duty to notify Kruse of SignTec's alleged misconduct.

### 3. NBI's Alleged Breach of Fiduciary and Good Faith Duties

Kruse asserts next that material issues of fact exist as to whether NBI breached a fiduciary duty and an implied duty of good faith owed to Kruse. The parties' fiduciary duty, according to Kruse, gave rise to the duty of good faith. *See Kreighbaum v. First Nat'l Bank & Trust*, 776 N.E.2d 413, 419–20 (Ind.Ct.App.2002) ("Whether [a fiduciary relationship] exists is essentially a question of fact."). As further support for the contention that NBI owed Kruse a duty of good faith, Kruse cites again to *Indiana Telco*: "It has long been the law in Indiana that a surety is a favorite of the law and that he must be dealt with in the utmost good faith." 297 N.E.2d at 435.

NBI disputes the existence of either a fiduciary or a good faith duty. In support of its position that NBI did not owe—let alone breach—a fiduciary duty, NBI quotes the following:

> [A] business or "arm's length" contractual relationship does not give rise to a fiduciary relationship. That is, the mere existence of a relationship between parties of bank and customer or depositor

does not create a special relationship of trust and confidence.... Absent special circumstances, a lender does not owe a fiduciary duty to a borrower.

*Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046–47 (Ind.Ct.App.2003) (internal citations omitted). As to the alleged duty of good faith, NBI writes, "Indiana does not recognize the existence of a covenant of good faith and fair dealing in all contracts." Appellee's Br. p. 28 (citing *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind.2002)). Recognizing the apparent absence of relevant caselaw in Indiana, NBI cites to caselaw from other jurisdictions, including New York and California, in support of the proposition that parties to a contract may expressly agree to behavior that would otherwise have been forbidden by an implied duty of good faith. *See, e.g., Horn v. New York Times*, 100 N.Y.2d 85, 760 N.Y.S.2d 378, 790 N.E.2d 753, 756 (2003) ("No obligation [of good faith and fair dealing] can be implied, however, which would be inconsistent with other terms of the contractual relationship."); *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710, 727 (1992) ("It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."). Finally, NBI asserts that this recognition of a right to contract away an implied duty of good faith is entirely consistent with Indiana's recognition and re-

---

**8.** "15. Once NBI personnel, including Mr. Kearns, told me SignTec was not in full compliance with its obligations under the Accounts Receivable Note and even though I was never informed of the full scope and extent of SignTec's breaches and defaults until the filing of this lawsuit, I made regular inquiries of NBI personnel, including Mr. Kearns, regarding the status of the Accounts Receivable Note...." Appellant's App. p. 98.

**9.** "9. On several occasions after March 28, 2002, Sean Kearns informed me that SignTec had never provided NBI with accurate monthly balance sheets, operating statements and accounts receivable as required by NBI in the Accounts Receivable Note." Appellant's App. p. 143.

spect for "freedom of contract." *See Zollman,* 780 N.E.2d at 391–92 ("Indiana courts have a lengthy tradition of recognizing and respecting the freedom to contract.").

■■■■ While there does not appear to be any Indiana caselaw discussing the implied duties that arise between creditor and guarantor, caselaw discussing the general concept of a "fiduciary duty" does not support the finding that NBI owed one to Kruse. For instance:

> A fiduciary relationship · does not exist between a lender and a borrower unless certain facts exist which establish a relationship of trust and confidence between the two. A confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, but the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage. Whether such a relationship exists is essentially a question of fact.

*Paulson v. Centier Bank,* 704 N.E.2d 482, 490 (Ind.Ct.App.1998) (internal citations omitted), *reh'g denied, trans. denied.* Here, it is clear from Kruse's supplemental affidavit that he was not in a position of "weakness" or unequal bargaining power; rather, Kruse professes to have a significant amount of business experience.[10]

Moreover, even if such a relationship did exist, Kruse has not shown that NBI wrongfully abused Kruse's confidence "so as to obtain an unconscionable advantage." *See id.*

■■ ■ We also find that the behavior Kruse considers indicative of a breach of good faith—standing "idly by while SignTec's secured collateral dissipated and, at the same time fail[ing] to inform Kruse of the full extent of SignTec's failure to perform under its obligations and the full extent of the obligations that SignTec was accruing to NBI for which NBI would hold Kruse liable," Appellant's Br. p. 22—was all behavior authorized by the Loan Agreement. Even if we accept that NBI owed Kruse an implied duty of good faith that was not contracted away, Kruse has failed to demonstrate that NBI has behaved in a manner that can be fairly characterized as bad faith:

> "Bad faith" is not simply bad judgment or negligence, rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

*Casa D'Angelo, Inc. v. A & R Realty Co.,* 553 N.E.2d 515, 519 (Ind.Ct.App.1990) (quoting *Stath v. Williams,* 174 Ind.App. 369, 367 N.E.2d 1120, 1124 (1977)), *trans. denied.* Given evidence of considerably more egregious conduct, we would not be unsympathetic to a "bad faith" argument; however, the facts of this case simply do not warrant the finding that NBI engaged

---

10. "2. I operate and have operated a number of businesses, including several farms and several manufacturing · and services companies. I operate a commercial real estate and real estate management business as well as a commercial equipment leasing business. I have bought and sold a number of businesses and am familiar with business recordkeeping.... I have been a partner, member, and shareholder in a number of businesses. I have had responsibility for interpreting accounts receivable listings and for collecting accounts receivable." Appellant's App. p. 142.

in "a conscious doing of a wrong because of dishonest purpose or moral obliquity." *See id.* Thus, we find there is no genuine issue of material fact as to whether NBI breached an existing fiduciary duty or duty of good faith to Kruse.

### 4. Estoppel & Kruse's Lack of Consent to Extensions

 Kruse also asserts that equitable estoppel should bar NBI's recovery from Kruse because, by obtaining Kruse's consent to extend the loan's maturity date, NBI induced Kruse to believe that any further extensions would also require his consent. An equitable estoppel requires a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice. *Ebersol v. Mishler,* 775 N.E.2d 373, 378–79 (Ind.Ct.App.2002), *trans. denied.* Equitable estoppel may arise from silence, or acquiescence, as well as from positive conduct. *Id.* However, silence will not form the basis of an estoppel unless the silent party has a duty to speak. *See Sheraton Corp. of Am. v. Kingsford Packing Co., Inc.,* 162 Ind.App. 470, 319 N.E.2d 852, 856 (1974) ("It is settled law in this State that the representation of fact necessary to such an estoppel may be accomplished by the conduct of a party, using the word conduct in its broadest meaning as including his spoken words, his positive acts, and *his silence when there is a duty to speak.*") (internal citations omitted) (emphasis supplied).

Although Kruse appears to concede that it was not necessary for NBI to obtain his consent before extending the maturity date, *see* Appellant's Br. p. 26, he nonetheless maintains that since NBI obtained his consent for the first amendment, he was thus induced to believe that NBI would obtain his consent for future amendments and extensions. As Kruse admits, however, the Guaranty he signed stated that he guaranteed to NBI the payment and performance of the debt evidenced by the following: "Note for $500,000.00 DTD 3/29/01; Maturing 3/28/02 and any extensions ... thereof (hereinafter referred to as the 'Indebtedness')." Given this language, it is clear that NBI was under no obligation to obtain Kruse's consent for future extensions.[11] Thus NBI's silence— or failure to obtain Kruse's consent—could not be the basis of estoppel, since NBI had no duty to Kruse in this regard.

### 5. Material Alteration of Terms of Underlying Debt, Effect on Kruse's Liability

 Kruse also asserts that there are genuine issues of material fact as to whether NBI materially altered SignTec's obligations by allowing SignTec to borrow amounts in excess of the Borrowing Base. "[W]hen the principal and obligee cause a material alteration of the underlying obligation without the consent of the guarantor, the guarantor is discharged from further liability." *Yin,* 665 N.E.2d at 64. "A material alteration which will affect a discharge must be a change which alters the legal identity of the principal's contract, substantially increases the risk of loss to the guarantor, or places the guarantor in a different position." *Id.*

---

11. "[T]he guarantor of a continuing guaranty on a note is not relieved of liability if the note is renewed, modified or extended. In this situation, a guaranty may be renewed or extended without the guarantor's knowledge." Alces, *supra,* at § 1:6 (footnotes omitted).

NBI contends, however, that Kruse prospectively consented to alterations of Sign-Tec's obligation:

> Pursuant to the terms of his guaranty, Kruse agreed "absolutely and unconditionally": (i) to pay the obligations of SignTec created by the Loan Agreement and any "extensions, renewals or replacements thereof"; (ii) that his liability would be "UNLIMITED"; (iii) that Indebtedness might be "created and continued in any amount"; and (iv) [that] his guaranty [would] continue "in spite of any modification of . . . maturities or other contractual terms applicable to the Indebtedness," without notice to him.

Appellee's Br. p. 21–22 (citing Appellant's App. p. 35, 116; Appellee's Add. p. 1–2). Moreover, NBI asserts that Kruse waived this issue by failing to present it to the trial court; waiver notwithstanding, NBI contends that Kruse failed to designate evidence to establish a genuine issue of material fact.

We are inclined to agree with NBI that Kruse prospectively agreed to unlimited liability and, in any event, failed to designate evidence sufficient to raise a genuine issue of material fact on the issue of material alteration.[12] Kruse simply does not present any documentation to substantiate this assertion; indeed, Kruse offers nothing more than repeated bald assertions that NBI loaned money in excess of the Borrowing Base. In his brief, for instance, Kruse writes,

One can infer from the evidence in the record, however, that the parties materially modified this agreement. There is evidence that NBI *never* received accurate financial statements, so it did not monitor whether or not amounts that it was lending to SignTec exceeded an amount equal to 80% of accounts receivable.

Appellant's Br. p. 25. The "evidence in the record" to which Kruse refers is, presumably, his own affidavits, in which he asserts that NBI personnel told him that SignTec had not complied with the Loan Agreement requirements.[13] Given Kruse's failure to designate evidence establishing a genuine issue of material fact as to whether there was a material alteration of Sign-Tec's underlying obligation, we find that Kruse's liability is unaffected and remains, as ever, unlimited.

### 6. NBI's Alleged Failure to Mitigate Damages, Effect on Kruse's Liability

 Finally, Kruse argues that NBI, as the non-breaching party to the Loan Agreement, had a duty to mitigate its damages. NBI concedes that Indiana adheres to this common law rule but asserts that Indiana also recognizes that "if the contract in question is an absolute guaranty, it 'casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor.' " Appellee's Br. p. 33 (quoting *McEntire v. Ind. Nat'l Bank*, 471 N.E.2d 1216, 1223 (Ind.Ct.App.1984), *reh'g denied, trans. denied*). Kruse, again,

---

12. We note that Indiana Trial Rule 56(F) provides a mechanism for performing discovery when a party opposing a motion for summary judgment cannot present by affidavit facts essential to justify his opposition.

13. As stated by NBI, "Kruse's Supplemental Affidavit is flush with testimony regarding his unfettered access to SignTec's books and records, including its receivables records, up to and including SignTec's bankruptcy. Yet, he offered no evidence to support his theories that SignTec 'likely' exceeded the Borrowing Base or that such occurrences permeated the relationship between SignTec and NBI." Appellee's Br. p. 24.

failed to designate any evidence to factually support his assertion that NBI did not attempt to mitigate its damages. Moreover, Paragraph 6 of the Guaranty states: "The liability of the Undersigned shall not be affected or impaired by any of the following acts or things ...:(iii) ... any delay or lack of diligence in the enforcement of Indebtedness...." Appellant's App. p. 116. Hence, we find that Kruse has not raised a genuine issue of material fact as to NBI's failure to mitigate damages.

### NBI's Entitlement to Appellate Attorneys' Fees

 Finally, we address NBI's request for appellate attorneys' fees. The relevant portion of the Guaranty provides, "The liability of the Undersigned shall be limited to a principal amount of $ *UNLIMITED* ..., plus accrued interest thereon and all attorneys' fees, collection costs and enforcement expenses referable thereto." *Id.* at 35. To quote another panel of this Court, "We agree that appellate attorneys' fees may be appropriately awarded if a contractual provision calls for them and the party requesting the fees prevails." *Yin,* 665 N.E.2d at 65. Given the above-quoted language of the Guaranty and the holding of this case, we remand to the trial court for the limited purpose of conducting a hearing to determine a reasonable appellate attorneys' fee. *See id.*

### Conclusion

We affirm the trial court's entry of summary judgment in favor of NBI, finding that Kruse has failed to show that there are any genuine issues of material fact affecting his guarantor liability. Given this finding, we need not reach the question of whether the trial court erred in striking Kruse's original affidavit.

Additionally, we remand this case to the trial court with instructions to determine the amount of appellate attorneys' fees to be added to NBI's judgment.

Affirmed.

SULLIVAN, J., and MAY, J., concur.