# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 29 2016, 9:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

David M. Mattingly
Angela Pease Krahulik
Olga Voinarevich
Ice Miller LLP
Indianapolis, Indiana

John D. Cox
Lynch, Cox Gilman, & Mahan, P.S.C.
Louisville, Kentucky

ATTORNEY FOR APPELLEE

Stephen W. Thompson
Stewart & Stewart Attorneys
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sportsdrome Speedway, Inc., *Appellant-Defendant,* | March 29, 2016 |
| v. | Court of Appeals Case No. 10A01-1505-CT-341 |
| | Interlocutory Appeal from the Clark Circuit Court |
| Jason Clark, *Appellee-Plaintiff.* | The Honorable Andrew Adams, Judge |
| | Trial Court Cause No. 10C01-1307-CT-122 |

**Kirsch, Judge.**

In this interlocutory appeal, Sportsdrome Speedway, Inc. ("Sportsdrome") appeals the trial court's denial of its motion for summary judgment in a case brought by Jason Clark ("Clark") for injuries he sustained when a racecar hit him as he volunteered[1] on the track for one of Sportsdrome's races, held on June 18, 2011. On appeal, we address the following consolidated and restated issue: whether the trial court erred in denying Sportsdrome's motion for summary judgment on Clark's claim that Sportsdrome and its employees were grossly negligent and acted in a willful and wanton manner with regard to Clark's safety.

We reverse and remand.

---

[1] The parties disagree as to whether Clark was acting as an employee or a volunteer at the time of the incident. Clark recognized that he was filling in for one of Sportsdrome's employees, yet claims that he was acting as a volunteer on June 18, 2011. Sportsdrome, however, maintains that Clark was in fact acting as its employee at the time he sustained his injuries. In interrogatories, Clark asked Sportsdrome what documents it had completed to support its position that Clark was an employee. In its answer to Interrogatory 20, Sportsdrome responded that: (1) it "had reported [Clark's] injuries to its Worker's Compensation carrier who paid out the sum of $30,999.00 for medical expenses"; (2) "[Clark] was told that he would be paid for that evening's work on the date the accident happened"; and (3) "[Clark's] duties were specifically explained to him by [Mike] Gibson and [Clark] agreed to the employment." *Appellant's App*. at 176. Sportsdrome maintains that if Clark was acting as Sportsdrome's employee, Clark's only remedy against Sportsdrome is under the Worker's Compensation Act ("Act"). *Id*. (citing Ind. Code § 22-3-2-6) (rights and remedies granted to employee under Act on account of personal injury, exclude employee's other rights and remedies against employer). This issue was not briefed by the parties, and its resolution has no bearing on the instant dispute. Accordingly, while we treat Clark as a volunteer for purposes of this memorandum decision, we do not decide or weigh in on any future determination of whether Clark acted as an employee or a volunteer on the night in question.

## Facts and Procedural History[2]

Between June 2009 through June 18, 2011, Clark volunteered at least sixty times at Sportsdrome's racetrack. Sportsdrome provided Clark with free admission when he helped out during races. Clark was familiar with Sportsdrome's racing events and the layout of the track, which was surrounded by a crash barrier and catch fence and could be used either as an oval track to run races clockwise or counter-clockwise, or in a figure-eight configuration. Some of Clark's duties included helping Sportsdrome employees to monitor races, break up fights, keep spectators clear from the pit road entrance/exit gate ("pit gate"), and clean up accidents that occurred during races. This work required Clark to enter dangerous areas of the track that were off-limits to the general public. Therefore, at the start of each evening that Clark worked, Sportsdrome required him to sign a "Release and Waiver of Liability and Indemnity Agreement" ("the Release"). It was only after Clark executed the Release that Sportsdrome allowed him to work in restricted areas of the racetrack.

---

[2] We heard oral argument on this case on January 21, 2016, in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

[4]     The Release was created to indemnify Sportsdrome and waive any liability it might incur due to injuries or damages related to Sportsdrome's own negligence or gross negligence.[3]  The Release provided:

> IN CONSIDERATION of being permitted to enter for any purpose any RESTRICTED AREA (herein defined as including but not limited to the racing surface, pit areas, infield, burn out area, approach area, shut down area, and all walkways, concessions and other areas appurtenant to any area where any activity related to the event shall take place), or being permitted to compete, officiate, observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED, for himself . . ., acknowledges, agrees and represents that he has, or will immediately upon entering any of such restricted areas, and will continuously thereafter, inspect such restricted areas and all portions thereof which he enters and with which he comes in contact, and he does further warrant that his entry upon such restricted area or areas and his participation, if any, in the event constitutes an acknowledgement that he has inspected such restricted area and that he finds and accepts the same as being safe and reasonably suited for the purposes of his use, and he further agrees and warrants that if, at any time, he is in or about restricted areas and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the restricted areas:
>
> 1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE THE . . . TRACK OPERATOR,

---

[3] Sportsdrome contends that gross negligence does not exist under Indiana law, *i.e.*, Indiana courts do not recognize gross negligence as being subject to any separate standard of care from that of negligence. *See Wohlwend v. Edwards*, 796 N.E.2d 781, 785, n.2 (Ind. Ct. App. 2003) ("Use of the term 'gross negligence' is inappropriate in Indiana because [Indiana's] common law does not recognize degrees of negligence.") (internal citations omitted). Sportsdrome maintains that mere negligence, simple negligence, significant negligence, or gross negligence are all simply negligence and any person can voluntarily agree to release another as to his or her negligent conduct. Our Supreme Court has noted, however, that negligence and gross negligence may be different in the context of what constitutes a breach and has defined gross negligence as: "'A conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party.'" *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003) (quoting Black's Law Dictionary 1057 (7th ed. 1999)). Here, we make no determination whether gross negligence exists in Indiana; instead, since both parties focus on the question of whether Sportsdrome acted in a willful and wanton manner, we do the same.

TRACK OWNER, . . . OWNERS AND LESSEES OF PREMISES USED TO CONDUCT THE EVENT(S), . . . AND THE DIRECTORS, OFFICERS, AGENTS AND EMPLOYERS, OF EACH OF THEM, ALL FOR THE PURPOSES HEREIN REFERRED TO AS THE "RELEASEES", FROM ALL LIABILITY to the undersigned . . . for any and all loss or damage, and any claim or demands therefore on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence or gross negligence of the "RELEASEES" or otherwise while the undersigned is in or upon the restricted area, and/or competing, officiating in, observing, working for, or for any purposes participating in the EVENT(S).

2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS THE "RELEASEES" and their insurance carriers and each of them from any loss, liability, damage, or cost they may incur due to the presence of the undersigned in or upon the restricted area or in any way . . . observing, or working for, or for any purpose participating at any time in the EVENT(S) and whether caused by the negligence or gross negligence of the "RELEASEES" or otherwise.

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE DUE TO THE NEGLIGENCE OR GROSS NEGLIGENCE OF "RELEASEES" OR OTHERWISE while in or upon the restricted areas and/or while. . . observing, or working for, or for any purpose participating in the EVENT(S). . . . EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver, and indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT . . . .

*Appellant's App.* at 156.

[5] Prior to June 18, 2011, Clark was usually stationed with Leondal Vincent ("Vincent"), a friend at the track who mostly worked in the pit at Turn 1. Clark acted as an extra set of hands under Vincent's specific direction and primarily helped clean the track after wrecks. The bulk of the remaining responsibilities fell to Vincent. On a few occasions, Clark was positioned at the Turn 4 pit gate, once with a track employee and a few other times with Vincent. Clark's experiences working in Turn 4 were substantially similar to his experiences working in Turn 1; Clark was supervised by an employee who would instruct him when things needed to be done, but most of the time, Clark could just sit, watch the race, and chat with others in the pit area.

[6] On the evening of June 18, 2011, Clark was running late and arrived at the track just as the races for the evening were about to begin. He signed the Release and was assigned to work at the Turn 4 pit gate as a stand-in for an employee who had not shown up for work. Clark retrieved a radio headset[4] and proceeded to Turn 4. Prior to that evening, Clark had never been stationed alone or unsupervised at Turn 4, but that night Clark was working alone at the Turn 4 pit gate. On the night of the accident, the races at the track were being filmed and monitored by Sportsdrome employee Greg Gibson from the position of an elevated scissor lift positioned in the main stretch of the racetrack.

---

[4] Clark explained that the headset was used to listen to track officials, who would inform workers if a car needed to come off the track because of a safety issue or if there was something happening on pit road that the workers or volunteers needed to know about. *Appellant's App.* at 145.

[7] Although the track was almost entirely surrounded by a crash barrier, Clark's assigned location at the Turn 4 pit gate had an opening through which cars entered and exited the racing surface. A number of races concluded that evening without incident; however, while Clark was still at the Turn 4 pit gate, an accident occurred on the racetrack that "caus[ed] a car to be propelled onto the crash barrier." *Id*. at 61. "As that car continued down the crash barrier, it reached the area near which [Clark] was stationed, crossed the gap in the barrier, struck the barrier where it begins again on the other side of the opening, pivoted outward and landed on [Clark]." *Id*. at 61, 67. Clark sustained physical injuries, including a broken pelvis and tailbone, broken ribs, and cuts on his leg, one of which required stitches. *Id*. at 110-11.

[8] Clark filed suit against Sportsdrome on May 31, 2013. In his complaint, Clark alleged that Sportsdrome was grossly negligent and acted in a willful and wanton manner because it knew of the risks to Clark, yet did not provide adequate assistance in the form of workers and volunteers, did not adequately train Clark, and stationed him alone and unsupervised in a dangerous area with which Clark was unfamiliar. Clark also alleged that Sportsdrome was grossly negligent and acted in a willful and wanton manner because it knew that the design and layout of its track was unreasonably dangerous, yet failed to take action to avoid the risk. *Id*. at 68-69.

[9] About a year and a half later, Sportsdrome filed a motion for summary judgment and a brief in support thereof, arguing that it was entitled to summary judgment on the negligence claim because Clark signed the Release

acknowledging that he was knowingly and willingly assuming risk of injury while working at the track. *Id*. at 16, 18-20. Sportsdrome also argued that Clark's evidence, at best, supported a claim of negligence regarding training and track design—not willful and wanton misconduct—because there was no "proof of any actual knowledge by Sportsdrome or evidence that it consciously disregarded the natural consequences of its actions." *Id*. at 16-17. Sportsdrome designated portions of Clark's deposition in support of its position.

[10] In his response in opposition to Sportsdrome's motion for summary judgment, Clark conceded "that absent the allegation of willful and wanton conduct on behalf of [Sportsdrome], the [R]elease executed in this matter would dispose of [Clark]'s negligence claim."[5] *Id*. at 54. Clark, however, maintained that Sportsdrome had committed willful and wanton misconduct by failing to act in the face of actual knowledge of the natural and probable consequences of injury to Clark and its opportunity to avoid said risk. *Id*. at 54-55. In its answer to interrogatories, Sportsdrome stated that it had told Clark to stand "to the side of the exit gate from which cars were coming," a location Sportsdrome claimed would have allowed Clark to avoid injury. *Id*. at 56; 174-75. Clark disagreed, arguing that he had been "instructed to stand on the opposite side of where the

---

[5] Although the signature area of the Release contained the words, "I HAVE READ THIS RELEASE," printed in red ink, Clark denied he had read the Release. *Appellant's App.* at 140. Clark, however, acknowledged that he was familiar with the Release and knew that it "[p]rotect[ed] the track's investments." *Appellant's App.* at 141. In other words, Clark knew that he was "releasing the track from liability if anything happened." *Id*. He also knew that his ability to enter the restricted areas at the track was contingent on signing the Release. *Id*.

cars were coming from." *Id*. at 55; 143. Further, Clark maintained that, because he was alone and unsupervised in an area that Sportsdrome knew was clearly dangerous, Sportsdrome should have explained Clark's duties to him. *Id*. at 55. Accordingly, Clark asserts that his positioning near the track relative to the traffic flow and his lack of experience created a genuine issue of material fact as to whether Sportsdrome acted in a willful and wanton manner when, knowing of the probability that Clark would be injured, it did not instruct him to move.[6]

[11] Sportsdrome filed its reply in support of its motion for summary judgment, reasserting that summary judgment was proper on Clark's claim of negligence and on his claim of willful and wanton misconduct. *Id*. at 247-50. Sportsdrome noted that Clark had already conceded any claim of negligence against Sportsdrome and argued that his failure to meet his burden of providing the trial court with a factual or legal basis to support his willful and wanton misconduct allegations warranted the entry of summary judgment in Sportsdrome's favor as to both claims. *Id.*

[12] During the hearing on the motion for summary judgment, Sportsdrome argued that summary judgment in its favor was appropriate on the negligence claim because Clark had signed a Release on the day of, and prior to, the accident.

---

[6] During the hearing on summary judgment, Clark made no argument regarding willful and wanton conduct as to the track design. Further, during oral argument, Clark's counsel, responding to Judge Brown's inquiry, stated that it had designated no evidence regarding the design of the track. It appears that Clark has dropped this claim.

*Tr.* at 6. Sportsdrome maintained that Clark understood: (1) the restricted areas into which he was placed provided less protection, and therefore, were more dangerous; (2) the significance of the Release, having signed one on sixty prior occasions in exchange for free admission to the track; and (3) that the Release barred Clark from bringing any claims of negligence against Sportsdrome in connection with the June 18, 2011 accident. *Id.* Sportsdrome characterized Clark's claim of willful and wanton misconduct as merely an attempt to avoid the constraints of the Release. *Id.* at 6-7. In response, Clark conceded, "If [the claim] was based solely on plain old negligence, we believe the Indiana Law bars recovery because of the [R]elease," but asserted that, in the present case, Sportsdrome's conduct was willful and wanton and the Release did not protect it. *Id.* at 19. Specifically, Clark argued that on June 18 he was standing in for an absent racetrack employee at the Turn 4 pit gate—a place "where cars can come onto the track and exit the track to go to the pits"— and that Sportsdrome's instructions to Clark and failure to supervise him placed him in harm's way. Clark maintained that Sportsdrome knew that injury to Clark was probable, and therefore, its conduct was willful and wanton. *Id.* at 11-13.

[13] The trial court denied Sportsdrome's motion for summary judgment without accompanying findings of fact or conclusions of law, "neither of which are required nor prohibited in ruling on summary judgment motions." *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 157 (Ind. 2014) (citing *City of Gary v. Ind. Bell Tel. Co.*, 732 N.E.2d 149, 153 (Ind. 2000)). Its sole finding was, "[T]here is

a genuine issue of material fact regarding the 'wanton and willful' misconduct or actions of [Sportsdrome] and/or its employees." *Appellant's App.* at 8. Sportsdrome filed its Motion for Reconsideration or, in the Alternative, to Certify for Interlocutory Appeal. The trial court certified the order, and our court accepted jurisdiction. Sportsdrome now appeals.

## Discussion and Decision

[14] Challenging the denial of summary judgment, Sportsdrome asserts two principal claims: (1) the trial court erred in not granting Sportsdrome's motion for summary judgment on Clark's negligence claims; and (2) the trial court erred in denying Sportsdrome's motion for summary judgment on Clark's claims of willful and wanton misconduct.[7] We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if

---

[7] We note that the trial court generally denied Sportsdrome's motion for summary judgment, stating, "[T]here is a genuine issue of material fact regarding the 'wanton and willful' misconduct or actions of [Sportsdrome] and/or its employees." *Appellant's App*. at 8. Thus, it neither granted nor denied Sportsdrome's motion with regard to Clark's claims of negligence.

the undisputed material facts support conflicting reasonable inferences." *Id.* (quoting *Williams*, 914 N.E.2d at 761) (internal citations omitted)). If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *VanDam Estate v. Mid-Am. Sound*, 25 N.E.3d 165, 168 (Ind. Ct. App. 2015), *trans. denied*.

[15] "Even though Indiana Trial Rule 56 is nearly identical to Federal Rule of Civil Procedure 56, we have long recognized that 'Indiana's summary judgment procedure . . . diverges from federal summary judgment practice.'" *Hughley*, 15 N.E.3d at 1003 (quoting *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994)). "In particular, while federal practice permits the moving party to show that the party carrying the burden of proof lacks evidence on a necessary element, [Indiana] impose[s] a more onerous burden: to affirmatively negate an opponent's claim." *Id.* (quotation marks omitted). In other words, "In Indiana, the party moving for summary judgment has the burden of establishing that no genuine issue of material fact exists." *Dennis v. Greyhound Lines, Inc.*, 831 N.E.2d 171, 173 (Ind. Ct. App. 2005) (citing *Jarboe*, 644 N.E.2d at 123), *trans. denied*. Only when the moving party has met this burden, does the burden shift to the non-movant to set forth specific facts demonstrating a genuine issue for trial. *Pfenning v. Lineman*, 947 N.E.2d 392, 396-97 (Ind. 2011). The party appealing from summary judgment has the burden of persuading us that the grant or denial of summary judgment was erroneous. *VanDam Estate*, 25 N.E.3d at 168.

As a general rule, the law allows competent adults the utmost liberty in entering into contracts that, when entered into freely and voluntarily, will be enforced by the courts. *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 392 (Ind. Ct. App. 2002). "A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action." *Id.* "'Our [S]upreme [C]ourt has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes.'" *Id.* (citation omitted). "The purpose of a release is to foreclose further claims." *Id.* Here, Clark makes no claim that the Release was invalid. In fact, he concedes that the Release barred him from bringing a negligence claim against Sportsdrome. *Appellee's Br.* at 1. To the extent that the trial court made no specific determination as to Clark's negligence claims, it erred in failing to grant summary judgment in favor of Sportsdrome as to any claim of negligence brought by Clark due to the fact he had signed the Release.

Notwithstanding the protection provided by a release, "Indiana courts have recognized that the waiver of liability protection cannot provide a party the right to intentionally hurt someone, including by misconduct that is "willful and wanton." *See U.S. Auto Club, Inc. v. Smith*, 717 N.E.2d 919, 924-25 (Ind. Ct. App. 1999) (upholding release as to such conduct is against public policy), *trans. denied. See also State Grp. Indus. (USA) Ltd. v. Murphy & Assocs. Indus. Servs., Inc.*, 878 N.E.2d 475, 479 (Ind. Ct. App. 2007) ("Although we have found no Indiana decision indicating that a party may not contract against liability for intentional tortious acts, this rule has a general consensus among our sister

states.") (citations omitted).  That being said, a contractual release cannot be avoided by "merely alleging intentional or near intentional conduct." *Appellant's Br*. at 12 (citing *U.S. Auto Club*, 717 N.E.2d at 925).

[18]  Sportsdrome maintains that Clark's willful and wanton conduct claims should be resolved as a matter of law because there is no genuine issue of material fact regarding Sportsdrome having actual knowledge of a probable injury.  Willful or wanton misconduct consists of either:  "1) an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time; or 2) an omission or failure to act *when the actor has actual knowledge of the natural and probable consequence of injury* and his opportunity to avoid the risk."  *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204-05 (Ind. Ct. App. 2011) (citing *U.S. Auto Club,* 717 N.E.2d at 924) (emphasis added).  "Whether the party has acted or failed to act, willful and wanton misconduct has 'two elements:  1) the defendant must have knowledge of an impending danger or *consciousness of a course of misconduct calculated to result in probable injury*; and 2) the actor's conduct must have exhibited an indifference to the consequences of his own conduct.'"  *Miner v. Sw. Sch. Corp.*, 755 N.E.2d 1110, 1113 (Ind. Ct. App. 2001) (quoting *Witham v. Norfolk & W. Ry. Co.*, 561 N.E.2d 484, 486 (Ind. 1990)).  Our Supreme Court has accepted that "'wanton and willful' and 'reckless' seem to imply the same disregard for the safety of others."  *Obremski v. Henderson*, 497 N.E.2d 909, 911 (Ind. 1986).  Willful or wanton misconduct is "so grossly deviant from everyday standards that the licensee or trespasser cannot be

expected to anticipate it." *Mohr v. Virginia B. Smith Revocable Trust*, 2 N.E.3d 50, 57 (Ind. Ct. App. 2014) (quoting *Harper v. Kampschaefer*, 549 N.E.2d 1067, 1070 (Ind. Ct. App. 1990), *trans. denied*), *trans. denied*. "Willfulness cannot exist without purpose or design." *Id.*

[19] Clark contends that Sportsdrome's willful and wanton conduct was its omission or failure to act when Sportsdrome had actual knowledge of the natural and probable consequence of injury to Clark and an opportunity to avoid the risk. In its motion for summary judgment, Sportsdrome claimed that Clark's willful and wanton conduct claims should be resolved as a matter of law. Sportsdrome offered that Clark "failed to provide even an iota of evidence" to demonstrate that Sportsdrome or its employees engaged in a conscious act that they knew would probably result in injury to Clark. *Appellant's Br.* at 15. Sportsdrome's statement of insufficient evidence, standing alone, would not meet Indiana's first burden for summary judgment because "[m]erely alleging that the plaintiff has failed to produce evidence on each element . . . is insufficient to entitle the defendant to summary judgment." *Dennis*, 831 N.E.2d at 173 (citing *Jarboe*, 644 N.E.2d at 123). In support of its claim, however, Sportsdrome designated portions of Clark's deposition. That designated material revealed that Clark had volunteered at the track on sixty prior occasions over a two-year period, had seen frequent wrecks, yet had never seen or heard about a "racing car going over the crash barrier." *Appellant's App.* at 36-37. Additionally, Clark had seen only one car go into the pit and had heard about only one person being injured—an official who was stationed at a "flag stand" that was "right on the

track pretty much." *Id.* at 35. Sportsdrome's showing of the relative absence of wrecked cars being propelled into the pit and the absence of injuries was enough to show that Sportsdrome lacked actual knowledge that injury to Clark was probable on June 18. The burden, therefore, shifted to Clark to show that a genuine issue of material fact existed.

[20] Clark offers that there is a genuine issue of material fact regarding the exact position where he was told to stand. *Id.* at 55. In its answer to interrogatories, Sportsdrome stated that it told Clark to stand "to the side of the exit gate from which cars were coming," a location Sportsdrome claimed would have allowed Clark to avoid injury. *Id.* at 56. In his deposition, Clark maintained that he had been "instructed to stand on the opposite side of where the cars were coming from." *Id.* at 55 (citing *Clark's Dep.* at 73-74). Further, Clark maintained that because he was alone and unsupervised, in an area that Sportsdrome knew was clearly dangerous, Sportsdrome should have explained Clark's duties to him. *Id.* at 55-56. Accordingly, Clark asserts that his position near the track relative to the traffic flow and his lack of experience created a genuine issue of material fact as to whether Sportsdrome acted in a willful and wanton manner because Sportsdrome knew of the probability that Clark would be injured by standing on the wrong side of the pit gate, and it did not instruct him to move.[8] We disagree.

---

[8] Clark contends that Sportsdrome's willful and wanton misconduct could be inferred from Sportsdrome's procurement of liability insurance, as well as its mandatory requirement that participants each sign a Release.

[21] Sportsdrome claims that this court's decision in *U.S. Auto Club v. Smith,* with "substantially similar" issues, is dispositive and mandates that we reverse the trial court's decision and grant summary judgment in favor of Sportsdrome. *Appellant's Br*. at 16 (citing *U.S. Auto Club*, 717 N.E.2d at 924-25). In that case, Smith, a widow, filed a wrongful death action against the defendants ("USAC") "for negligence, alleging that the design of the track and crowd control measures in the infield pits were inadequate." *U.S. Auto Club*, 717 N.E.2d at 921. Smith also alleged willful and wanton conduct as well as gross negligence, asserting that USAC was liable for her husband's ("Larry") injuries "because it knew or should have known of the dangerous conditions in the pit area and that injuries were likely to result." *Id*. Smith asserted that USAC was liable because it breached a duty in failing to take even minimal steps to make the pits reasonably safe for those individuals who chose to remain in that area during the race. *Id.*

[22] Prior to entering the pit area, Larry had signed a waiver agreeing to release USAC from all liability. *Id*. at 921. USAC raised the waiver as an affirmative defense to Smith's negligence claims. *Id*. Smith responded that the release was not sufficient to bar her claims as a matter of law, and in the alternative, that even if the release was valid, USAC's acts rose to the level of willful and

---

*Id*. at 55-56. Assuming without deciding that inferences can be made from these documents, these documents provide no insight into what Sportsdrome knew about Clark's probable injury on June 18. The only inference that could be drawn from these documents is that being in a restricted area of the Sportsdrome racetrack can be dangerous, a fact about which both parties agree.

wanton misconduct. *Id.* at 922. To substantiate her willful and wanton allegations, Smith offered affidavits of various racing experts, who unanimously concluded that the safety design of the racetrack was in fact "reprehensible" and "grossly inadequate." *Id.* at 924. USAC moved for summary judgment on both claims, but the trial court denied the motion, stating in part that "genuine issues of material fact remained as to whether USAC's omission of safety devices in the infield as well as the purported defective design of the track amounted to willful or wanton misconduct." *Id.* at 922.

[23] On appeal, our court reversed the trial court's decision, finding that the negligence claims were barred by the waiver and that "the designated evidence failed to demonstrate that USAC engaged in willful or wanton misconduct." *Id.* at 925. In its decision, this court announced the legal standard for willful and wanton claims and noted that to establish that a defendant's conduct is "willful and wanton[,]" a plaintiff must show "an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk." *Id.* at 924 (citing *Witham*, 561 N.E.2d at 486). Applying that standard to the facts, the court concluded that even the experts' affidavits were insufficient to prove willful and wanton misconduct because nothing in the record suggested that USAC committed an act or omission that it knew was improper, and the allegation in the expert's affidavits "fail[ed] to identify any specific factual evidence or foundation to support their conclusions about USAC's actions." *Id.* Stated differently, our court found, "[T]here is simply no evidence to support an inference that USAC

believed the accident was imminent, likely or probable, much less that they willingly subjected themselves and their racing colleagues to such risks." *Id*. at 925. Finding no evidence in the record to support Smith's claim that USAC acted in a willful or wanton manner, we reversed the trial court's denial of summary judgment, remanded to the trial court, and ordered that judgment be ordered in USAC's favor. *Id*.

[24] Here, unlike Smith, Clark did not designate affidavits of testimony procured from well-known racing experts to support his willful and wanton claim. Instead, he argues that construing the record in the light most favorable to him it is clear that he was never given training or instruction on the proper way to monitor race traffic, he was told to stand on the wrong side of the Turn 4 pit gate—one of the most dangerous turns because it is not fully protected by crash barriers—and he volunteered alone in Turn 4. *Appellee's Br*. at 10. Clark maintains that Sportsdrome knew that he was on the wrong side of the pit gate because, on the night of the accident, Sportsdrome employee Greg Gibson was filming the races from the position of an elevated scissor lift positioned in the main stretch of the racetrack. Clark contends that it can be inferred that Gibson knew Clark was in the wrong place, yet failed to alert Clark over the headset. Clark argues that these factors bear on the issue of whether Sportsdrome committed a willful or wanton omission. *Id*. Under the facts of this case, we disagree.

[25] While some of these factors are admittedly in dispute, they do not constitute genuine issues of material fact. None of these allegations sheds light on the

pivotal question—did Sportsdrome have actual knowledge that any of these events would result in probable injury to Clark. Here, it is not important whether Clark had training, was placed in an improper position in Turn 4, was stationed alone, or was not contacted through the headset. These factors do not speak to the issue of whether Sportsdrome knew that injury to Clark was *probable*. Clark had volunteered at the racetrack on sixty prior occasions and each time had been required to sign the Release. The Release revealed both parties' understanding that the restricted areas of the racetrack were more dangerous than the areas open to the general public. Clark understood that accidents were frequent and even admitted that the "main reason" he started going to the track "was to watch the wrecks." *Appellant's App.* at 152. Even so, Clark had never seen a car go over a crash barrier, had only heard about one person being injured in the two years that he had volunteered at the track, and had only seen one car breach the entry to the pit.

[26]     On the night in question, a number of races concluded without incident; however, while Clark was still at the Turn 4 pit gate, an accident occurred on the racetrack that "caus[ed] a car to be propelled onto the crash barrier." *Appellant's App.* at 61. The car did not simply shoot into the Turn 4 pit gate; instead, "[a]s that car continued down the crash barrier, it reached the area near which [Clark] was stationed, crossed the gap in the barrier, struck the barrier where it begins again on the other side of the opening, pivoted outward and landed on [Clark]." *Id.* at 61, 67. The fact that a racecar entered the pit gate was unusual, and even more unusual was the fact that the car hit Clark. The

record does not show that Sportsdrome had actual knowledge that an accident was probable, let alone that an injury to Clark was probable. Constructive knowledge is not sufficient, and where a plaintiff fails to provide adequate evidence for his allegations, Indiana courts do not hesitate to dispose of such claims as matter of law. *Westray v. Wright*, 834 N.E.2d 173, 181 (Ind. Ct. App. 2005). In the absence of any genuine issue of material fact, the trial court erred when it denied Sportsdrome's motion for summary judgment.

For the foregoing reasons, we reverse the trial court's denial of Sportsdrome's motion for summary judgment and remand with instructions to enter summary judgment in favor of Sportsdrome on Clark's claims.

Reversed and remanded.

Mathias, J., and Brown, J., concur.